Filed 7/5/2016

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re AUTOMOBILE ANTITRUST CASES I and II. | A134913<br><br>(City & County of San Francisco Judicial Council Coordination Proceeding Nos. 4298, 4303) |

In this coordinated proceeding, certain purchasers of new automobiles in California (plaintiffs) brought state law claims against a number of automobile manufacturers and dealer associations under the Cartwright Act (Bus. & Prof. Code, §§ 167201–6728) and the Unfair Competition Law (Bus. & Prof. Code, §§ 17200–17210). Specifically, the plaintiffs allege that the defendant manufacturers and associations conspired to keep lower-priced, yet virtually identical, new cars from being exported from Canada to the United States, thereby keeping new vehicle prices in California higher than they would have been in a properly competitive market. After years of litigation, the trial court granted summary judgment in favor of the two remaining defendants in the case—Ford Motor Company (Ford U.S.) and its subsidiary, Ford Motor Company of Canada, Ltd. (Ford Canada) (collectively, Ford)—concluding that the plaintiffs had failed to produce sufficient evidence of an actual agreement among Ford and the other manufacturers to restrict the export of new vehicles from Canada to the United States.

1

On appeal, the plaintiffs challenge the trial court's grant of summary judgment in favor of Ford, arguing that the evidence presented in this case was more than sufficient to raise a triable issue of material fact as to the existence of an illegal agreement to curb exports. In addition, they claim that the trial court improperly excluded certain direct evidence of the alleged conspiracy. Based on our de novo review of this matter, we conclude that summary judgment was appropriately granted to Ford U.S. However, we agree with the plaintiffs that the admissible evidence presented was sufficient to demonstrate the existence of a material fact as to whether Ford Canada participated in an illegal agreement to restrict the export of automobiles from Canada to the United States in violation of the Cartwright Act.[1] We therefore reverse the trial court's grant of summary judgment in favor of Ford Canada.

## I. BACKGROUND

### A. *Preliminary Matters*

This litigation began over a decade ago when, in early 2003, more than a dozen different lawsuits were filed in California against various automobile manufacturers and trade associations, each alleging state law causes of action for antitrust conspiracy and unfair business practices and each filed as a class action on behalf of individuals who purchased or leased new vehicles in California that were manufactured or distributed within a certain period of time by one of the named defendants. The lawsuits were eventually coordinated into this proceeding. (*In re Automobile Antitrust Cases I and II* (2005) 135 Cal.App.4th 100, 106 (*Automobile Antitrust Cases*).) Thereafter, in October 2003, the plaintiffs filed their consolidated

---

[1] The trial court concluded below that the plaintiffs' unfair competition claim was founded upon the alleged violation of the Cartwright Act, and was thus derivative of the complaint's antitrust allegations. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 866–867 (*Aguilar*); *Eddins v. Redstone* (2005) 134 Cal.App.4th 290, 344. The plaintiffs have not challenged this determination on appeal. Since the two causes of action stand or fall together, we will not separately discuss the plaintiffs' unfair competition claim.

amended class action complaint, the operative pleading in this matter.[2]  In addition to Ford, the class action complaint named numerous other automobile manufacturers as defendants.[3]  Also designated as defendants were the Canadian Automobile Dealers Association (CADA)—a trade organization that represents, promotes, and protects the interests of franchised automobile dealers in Canada—and the National Automobile Dealers Association (NADA), CADA's United States counterpart.  (See *ibid.*)  All told, the manufacturer defendants accounted for approximately 88 percent of automobile sales in the U.S. and Canada from 2001 to 2003.  Sales by Ford, General Motors, and Chrysler—sometimes referred to as the "Big 3"—constituted approximately 67 percent of that market.

As indicated above, the complaint alleges that the defendant automobile manufacturers and dealer associations violated state antitrust and unfair competition laws by conspiring to restrict the movement of lower-priced Canadian vehicles into the U.S. market, thereby avoiding downward pressure on new vehicle prices in the United States.  According to the plaintiffs, during the timeframe relevant to this

---

[2] The plaintiffs—the majority of whom eventually became class representatives in this litigation—are George Bell, Wei Cheng, Laurance de Vries, Joshua Chen, Jason Gabelsberg, Ross Lee, Jeffrey M. Lohman, Christine Nichols, Local 588 of the United Food & Commercial Workers Union, Estelle Weyl, Michael Wilsker, and W. Scott Young.  Each plaintiff alleges an injury caused by one or more of the defendants.

[3] The named manufacturer defendants include:  General Motors Corporation (GM) and General Motors of Canada, Ltd. (GM Canada) (collectively, General Motors); Volkswagen AG, Volkswagen of America, Inc., and Volkswagen Canada, Inc. (Volkswagen Canada); Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., and Toyota Canada, Inc. (Toyota Canada) (collectively, Toyota); Honda Motor Company, Ltd. (Honda Japan); American Honda Motor Co., Inc., and Honda Canada, Inc. (Honda Canada) (collectively, Honda); DaimlerChrysler Aktiengesellschaft (DaimlerChrysler AG); DaimlerChrysler Corporation (DaimlerChrysler U.S.), DaimlerChrysler Motors Co., LLC, and DaimlerChrysler Canada, Inc. (Chrysler Canada) (collectively, Chrysler); Nissan Motor Company, Ltd. (Nissan Japan), Nissan North America, Inc. (Nissan USA), and Nissan Canada, Inc. (Nissan Canada); Bayerische Motoren Werke Aktiengesellschaft (BMW AG), BMW of North America, LLC, and BMW Canada, Inc. (BMW Canada); and various subsidiaries of these entities.

litigation, the defendant automobile manufacturers typically charged their California dealers between 10 and 30 percent more than they charged their Canadian dealers for the same make and model vehicle. Ford Canada, for example, estimated that a 2000 Model F350 Crewcab 4x4 DRW Lariat could be imported from Canada and sold at a price $8,265 less than its United States counterpart ($29,569 as opposed to $37,834). Maintenance of this two-tiered pricing system required the continued segregation of the Canadian and U.S. automobile markets.

Beginning in the 1990's, however, trade policy between the United States and Canada made exporting simpler and less expensive. Moreover, after the safety and environmental regulations governing new vehicles sold in the United States and Canada were harmonized between 1998 and 2000, the vehicles sold in the two countries became virtually identical.[4] Then, from at least 2001 through 2003, the currency exchange rate differential between the strong United States dollar and the cheaper Canadian dollar made export sales increasingly attractive. (See *In re New Motor Vehicles Can. Export Anti. Lit.* (1st Cir. 2008) 522 F.3d 6, 9–10.) Faced with this particularly advantageous arbitrage opportunity,[5] exporters began buying more and more Canadian vehicles and selling them in the United States to franchised dealers, dealers of another brand, independent dealers, and used car dealers. This created a discount distribution channel, or "gray market" for Canadian vehicles in the United States.[6]

---

[4] Specifically, according to the plaintiffs, the only changes typically required for Canadian vehicles exported to the United States were replacement of odometers/speedometers (Canadian automobiles record kilometers, while United States automobiles record miles) and certain headlight adjustments. (*Automobile Antitrust Cases*, *supra*, 135 Cal.App.4th at pp. 105–106 & fn. 2.)

[5] "Arbitrage describes the practice of simultaneously buying and selling identical securities, currency, or other assets in different markets, 'with the hope of profiting from the price difference in those markets.'" (*In re New Motor Vehicles Can. Export Anti. Lit.*, *supra*, 522 F.3d at pp. 9–10 & fn. 2.)

[6] "A gray market is one 'in which the seller uses legal but sometimes unethical methods to avoid a manufacturer's distribution chain and thereby sell goods (esp. imported goods)

The plaintiffs claim that, in the face of this mounting activity by exporters, the manufacturer defendants illegally agreed that they would all hold firm, each doing their part to stamp out Canadian exports, rather than taking the profits available by permitting their Canadian dealers to sell Canadian cars freely into the U.S. market. According to the plaintiffs, this alleged conspiracy was created and implemented through a series of meetings and conference calls among the defendant manufacturers. These contacts were facilitated by a number of trade associations, including: CADA; the Canadian Vehicle Manufacturers' Association (CVMA), which represented the "key or leading" automobile manufacturers in Canada, including Ford Canada, Chrysler Canada, and GM Canada; and the Association of International Automobile Manufacturers of Canada (AIAMC), which represented international manufacturers such as Honda Canada, Toyota Canada, Nissan Canada, BMW Canada, and Volkswagen Canada.

The plaintiffs further contend that the manufacturers used a variety of different tools to discourage the export of new Canadian vehicles to the United States, thereby furthering the goals of their conspiracy. By the late 1980's, for example, Ford had modified its Canadian dealer franchise agreements (generally Franchise Agreements) to forbid export sales. The Franchise Agreements of other manufacturers contained similar provisions. In addition, manufacturers created and frequently updated "blacklists" of entities known to export vehicles for resale so that their Canadian dealers could consult the lists and refrain from selling to those entities. Additionally, the manufacturers began tracking every vehicle's unique Vehicle Identification Number (VIN) to determine which new vehicles made for sale in Canada had actually been exported to the United States. Once an exported vehicle was traced back to the particular dealer who made the export sale, many Franchise Agreements allowed for the imposition of "chargebacks," substantial fines (often in the thousands

---

at prices lower than those envisioned by the manufacturer.' " (*In re New Motor Vehicles Can. Export Anti. Lit.*, *supra*, 522 F.3d at pp. 9–10 & fn. 3.)

of dollars) paid by the dealer to the manufacturer. The manufacturers also imposed vehicle allocation restrictions on exporting Canadian dealers, and, at times, pursued termination of dealers engaged in the export trade. Ford, for example, initiated successful termination proceedings against a dealer that had a high incidence of export sales in 1999 and 2000.

Some manufacturers also required their Canadian dealers to include "no export" clauses in their sales agreements, under which buyers, themselves, could be required to pay a penalty if the purchased vehicle was transferred to the United States within a designated period of time. Moreover, Canadian dealers were required to conduct a "due diligence" investigation of every buyer to identify potential exporters. If a Canadian car arrived in the United States despite the erection of these substantial barriers to export, manufacturers voided warranties for the repair of new vehicles exported from Canada, declined to provide information regarding recalls, and withheld certificates of origin from exporters. Distribution controls were also placed on the parts used to convert odometers from kilometers to miles.

Although the cross-border sale of *used* vehicles began to skyrocket in 1999 and 2000 and continued at very high levels throughout the alleged conspiracy period, plaintiffs presented evidence that the manufacturers' multi-faceted attempt to restrict the export of *new* vehicles from Canada to the United States proved effective. In fact, export sales of new vehicles actually decreased during the alleged conspiracy period, despite circumstances amounting to a "perfect storm" for cross-border arbitrage. (Cf. *In re New Motor Vehicles Can. Export Anti. Lit.*, *supra*, 522 F.3d at p. 10.) The plaintiffs maintain that cutting off this discount distribution channel allowed the defendant automobile manufacturers to sell or lease new cars in California, and indeed throughout the United States, at artificially inflated prices. Thus, according to the plaintiffs, class members paid more to buy or lease new vehicles during the conspiracy period than they would have in the absence of defendants' illegal agreement to restrict exports. The plaintiffs' expert estimates total class damages at $1.073 billion.

6

During 2004 and into 2005, the trial court considered a number of preliminary motions filed by the defendants, including motions contesting personal jurisdiction and demurrers to the consolidated complaint. For example, the trial court concluded that it lacked personal jurisdiction over four of the nonresident defendants—Honda Japan, Volkswagen AG, Nissan Japan, and CADA—and thus granted their motions to quash service of summons. (*In re Automobile Antitrust Cases*, *supra*, 135 Cal.App.4th at p. 105.) We subsequently affirmed this determination on appeal. (*Ibid.*)

In addition, a similar lawsuit had been filed in federal court against many of the same defendants, alleging violation of federal antitrust laws. (See *In re New Motor Vehicles Canadian Export* (D. Me. 2004) 307 F.Supp.2d 136, 137–138 (the federal multidistrict litigation or MDL).) Parallel cases were also pending in a number of other state courts. In June 2004, the trial court issued an order, after consultation with Judge Hornby—the judge in the federal MDL—coordinating discovery among this action, the federal action, and other state actions.

The plaintiffs filed their motion for class certification in the instant matter in the Spring of 2005. Proceedings were stayed, however, while the parties conducted extensive coordinated discovery and litigated their class certification motion in the federal MDL.[7] Ultimately, in May 2009, the trial court granted plaintiffs' motion for class certification in this proceeding. The court defined the class generally as: "All persons and entities residing in California on the date notice is first published, who

---

[7] Although Judge Hornby certified a nationwide injunctive class and exemplar state damage classes (including a California class) in 2006, the First Circuit subsequently vacated his certification orders in 2008. (*In re New Motor Vehicles Can. Export Anti. Lit.*, *supra*, 522 F.3d 6; *In re New Motor Vehicles Canadian Export Antitrust* (D. Me 2006) 235 F.R.D. 127 [certifying exemplar state damage classes]; *In re New Motor Vehicles Canadian Export Antitrust Litigation* (D. Me 2006) 2006 U.S. Dist. LEXIS 10240 [certifying nationwide injunctive class].) The plaintiffs later elected not to pursue California class certification in the federal action and Judge Hornby dismissed the California claims. (*In re New Motor Vehicles Canadian Export Litig.* (D. Me 2009) 632 F.Supp.2d 42, 63.)

7

purchased or leased a new motor vehicle manufactured or distributed by a defendant, from an authorized dealer located in California, during the period January 1, 2001 through April 30, 2003, for their own use." We later denied defendant's petition for writ of mandate seeking review of the class certification order. (*General Motors of Canada, Ltd. v. Superior Court* (Aug. 13, 2009, A125424) [nonpub. order].)

In the interim, Judge Hornby issued an opinion on July 2, 2009, in the federal MDL action, addressing the viability of the remaining state law damage claims. (*In re New Motor Vehicles Canadian Export Litig.*, *supra*, 632 F.Supp.2d at pp. 42, 44–45.) Before the federal court were summary judgment motions from each of the remaining manufacturer defendants challenging the existence of a conspiracy and a joint summary judgment motion arguing lack of evidence of antitrust impact. (*Id.* at p. 45.) With respect to the conspiracy issue, Judge Hornby concluded that there "is probably enough evidence to reach a jury on whether the manufacturers had an illegal horizontal agreement." (*Id.* at p. 47.) Of particular interest here, the judge opined that this conclusion "is easiest for Ford and Chrysler; it is somewhat closer for GM because of disclaimer statements it made; it is closest of all for the Honda and Nissan entities because for them the evidence is almost entirely circumstantial." (*Ibid.,* fns. omitted.) In the end, however, Judge Hornby did not finally decide the issue, because he concluded that the manufacturers were entitled to summary judgment on the issue of antitrust impact.[8] (*Id.* at p. 45.)

While this litigation progressed in both state and federal courts, Toyota reportedly agreed to settle. Additionally, in 2009, both GM and DaimlerChrysler declared bankruptcy, effectively removing them from the case. Following these

---

[8] The parties disagree as to the import of Judge Hornby's conspiracy discussion. While certainly relevant, we do not view Judge Hornby's analysis as binding on us in any way, especially since he appears to have considered much more of the plaintiffs' evidence than our own trial court did. (*In re New Motor Vehicles Canadian Export Antitrust Litigation*, *supra,* 632 F.Supp.2d at pp. 47–50.)

settlements and bankruptcies, the remaining defendants litigating this action were Ford, GM Canada, Nissan USA, and Honda.

**B.      *Ford's Summary Judgment Motion and Plaintiffs' Response***

In January 2010, Ford filed a motion for summary judgment, arguing that the plaintiffs could not prove on the evidence presented that Ford's conduct in restraining exports during the identified conspiracy period was more likely than not the result of an unlawful agreement rather than independent action.[9]  Specifically, Ford advanced evidence that it had been independently combating the problem of what it termed "gray market exports" for decades prior to the designated conspiracy period and continued to do so during that period for the same legitimate business reason—that is, to preserve the integrity of its dealer distribution system.  Given this non-conspiratorial explanation for its enforcement of export restraints, Ford argued that its conduct was as consistent with permissible competition as it was with unlawful conspiracy.  Thus, summary judgment in its favor was appropriate.  In addition, although Ford conceded that it had attended a number of meetings with other manufacturers during the conspiracy period at which possible joint action to combat the export problem was discussed, it asserted that no such joint action was ever taken as a result of those meetings.  Indeed, Ford claimed that its actions to stop exports after these industry meetings clearly differed from the methods used by its competitors to combat exports, making it "impossible" for the plaintiffs to establish any kind of conspiracy among the defendants.

In opposition to Ford's summary judgment motion, the plaintiffs contended that they had produced documentary and testimonial evidence showing that the defendants made a conscious commitment to a common scheme—the restraint of

[9] The other manufacturers filed similar summary judgment motions on the conspiracy issue, which are not included in the record before us.  In addition, all of the remaining defendants filed a joint motion for summary judgment on the issue of antitrust impact as well as a motion to exclude the opinions and testimony of plaintiffs' expert witness, Robert E. Hall, Ph.D.  Although fully briefed, these two joint motions have not been argued or decided by the trial court.

Canadian new vehicle exports to the United States—and thus summary judgment was inappropriate. Further, the plaintiffs suggested that the manufacturers' claimed "legitimate business reason" for their export restraints was likely pretextual given the economic realities of the situation. Specifically, according to plaintiffs' expert, absent an agreement among the manufacturers to block exports, all defendant manufacturers facing competition from Canadian exports would have maximized profits by lowering list prices in the United States rather than losing U.S. sales to competitors' Canadian exports. Finally, the plaintiffs' argued that it was irrelevant that the manufacturers did not impose the exact same export restrictions during the alleged conspiracy period. Rather, evidence that all of the manufacturers imposed some form of restraint during the relevant timeframe and that none chose to abandon their export controls in favor of quick profits was sufficient evidence of parallel conduct.

## C.    *The Summary Judgment Hearings and Decisions*

The trial court ultimately held a number of hearings on the four summary judgment motions before it which argued lack of an actionable conspiracy. After hearing on January 18, 2011, the trial court granted summary judgment motions in favor of Nissan USA and Honda. In particular, the trial court concluded that the evidence produced by the two manufacturers—including evidence of a legitimate business purpose for the challenged conduct, denials of wrongful behavior, and evidence of refusal to participate in meetings that might possibly have been viewed as conspiratorial—was sufficient to shift the burden to the plaintiffs to produce evidence of an issue of material fact regarding the existence of the alleged conspiracy. Although the trial court acknowledged that such a conspiracy was "in the economic self-interest of each of the defendants, perhaps," it did not find this fact probative of the existence of an impermissible agreement among the parties, which it deemed "the heart" of any Cartwright Act claim. Nor did it find evidence of shared warranty policies or of the "stepping up" of anti-export activities after the date of the alleged conspiracy particularly relevant to the existence of an actionable agreement.

10

In sum, since the evidence submitted by the plaintiffs was "not sufficient to raise a plausible inference that either Honda or Nissan USA entered into an agreement with any competitor to restrict export sales from Canada," the trial court granted both parties' summary judgment motions.

The trial court next turned to the summary judgment motions of Ford and GM Canada. At a hearing on January 24, 2011, the court discussed its tentative decision to deny the summary judgment motions of both manufacturers. As with Honda and Nissan USA, the trial court concluded that the evidence produced by Ford and GM Canada—including evidence of a legitimate business purpose behind the conduct at issue, denials of any wrongful behavior, and refusals to participate in certain joint export activities—was sufficient to shift the burden to the plaintiffs to establish an issue of material fact regarding the existence of the alleged conspiracy. In the case of Ford and GM Canada, however, the trial court initially believed that the plaintiffs had satisfied their burden, creating a material issue of fact with respect to the existence of an unlawful agreement to restrict exports in violation of the Cartwright Act. As the court framed the issue, the crucial question was whether the manufacturers acted independently to restrict exports or whether they agreed "to take steps in concert to reduce the flow of cars."

In response, Ford first maintained that there was no evidence that Ford U.S. "conspired with anyone in Canada to do anything." Ford further asserted that, with respect to Ford Canada, the evidence established, at most, that the manufacturer attended meetings and conference calls at which possible solutions to the export problem were discussed. But, according to Ford, no agreement with respect to any particular joint course of action was ever reached. Rather, Ford strenuously claimed, the evidence established that it had been taking unilateral action to curb exports for 15 years, and there was no evidence that its actions changed in any way during the period of the alleged conspiracy. GM Canada made similar arguments, stressing its repeated refusals, when asked, to engage in meetings or any kind of joint activity.

11

After argument, the trial court directed the plaintiffs to submit a summary of their conspiracy evidence.

While these summary judgment proceedings were pending, however, GM Canada agreed to settle its four remaining state court actions, including this California proceeding. This left Ford U.S. and Ford Canada as the sole remaining defendants in the case. At the continued hearing on May 10, 2011, the plaintiffs reviewed the evidence they believed supported the existence of an unlawful agreement to restrain exports. Ford then challenged the plaintiffs' evidence and conclusions. In the end, the trial court authorized certain additional filings and indicated that it would take the matter under submission as of July 8, 2011.

Thereafter, by order dated November 4, 2011, the trial court granted the summary judgments motions of both Ford U.S. and Ford Canada.[10] Specifically, the trial court found that the evidence produced by the two manufacturers was sufficient under *Aguilar, supra,* 25 Cal.4th 826, to shift the burden to the plaintiffs to produce evidence of an issue of material fact regarding the existence of the alleged conspiracy. However, contrary to its earlier tentative ruling, the trial court now determined that the plaintiffs had failed to satisfy this burden.

In particular, the trial court concluded that while Ford "met at different times with other alleged co-conspirators and discussed their common problem of the importation of cars from Canada to the United States, . . . such discussion of a common problem by itself is not a violation of the Cartwright Act." Further, the trial court opined that, where there was insufficient evidence of an agreement, evidence that information was exchanged among alleged co-conspirators, or that some alleged co-conspirators "stepped up" their efforts to restrict exports after the start of the alleged conspiracy period, was not enough to carry plaintiffs' burden. Finally, the

---

[10] In conjunction with its order granting summary judgment, the trial court issued separate orders ruling on the plaintiffs' objections to Ford's evidence, Ford U.S.'s evidentiary objections, and the objections to the plaintiffs' evidence filed by Ford Canada.

12

trial court stated that the evidence presented by the plaintiffs regarding the alleged co-conspirators' motive and economic interest to conspire was insufficient, standing alone, to satisfy the plaintiffs' burden of production. In sum, under *Aguilar*, "[t]here was no evidence to support a conclusion that it was more likely than not that [Ford U.S.] and/or Ford Canada entered into an agreement with any other alleged co-conspirator."

Final judgment was entered with respect to Ford U.S. on January 9, 2012, and with respect to Ford Canada on January 13, 2012. The plaintiffs' timely notice of appeal again brought the matter before this court.

## II. EVIDENTIARY ISSUES

We first address the plaintiffs' challenge to two evidentiary rulings made by the trial court in connection with the summary judgment motion here at issue. Specifically, the plaintiffs contend that, in making its summary judgment determination, the trial court erred in refusing to consider on hearsay grounds certain deposition testimony of Pierre Millette, general counsel for Toyota Canada, regarding a May 15, 2001, CADA meeting, as well as the minutes of that meeting that were prepared by a CADA employee. The hearsay rule is easily articulated: Hearsay evidence is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) It is generally inadmissible, absent a recognized exception to the rule. (*Id.*, § 1200, subd. (b); see also *People v. Seumanu* (2015) 61 Cal.4th 1293, 1307 (*Seumanu*) [" '[h]earsay is generally excluded because the out-of-court declarant is not under oath and cannot be cross-examined to test perception, memory, clarity of expression, and veracity, and because the jury (or other trier of fact) is unable to observe the declarant's demeanor' "].)

Of course, when dealing with the hearsay rule, the devil is in the details of its application to the facts of a particular case. As we review the trial court's treatment of the alleged hearsay in this matter, we note that there is some dispute regarding our standard of review for such determinations. "[T]he weight of authority holds that an

13

appellate court reviews a court's final rulings on evidentiary objections by applying an abuse of discretion standard." (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694 (*Carnes*); see also *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852.) However, in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512 (*Reid*), our high court acknowledged the argument that a different rule should apply when evidentiary rulings are made in the context of a summary judgment motion: " 'Because summary judgment is decided entirely on the papers, and presents only a question of law, it affords very few occasions, if any, for truly discretionary rulings on questions of evidence. Nor is the trial court often, if ever, in a better position than a reviewing court to weigh the discretionary factors.' " (*Id.* at p. 535, quoting the appellate court opinion). Ultimately, the *Reid* Court concluded that it "need not decide generally whether a trial court's rulings on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo." (*Ibid.*; see also *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255, fn. 4 (*Nazir*) [observing that the standard of review is unsettled].)

Similarly, we will not here resolve this outstanding issue, as our conclusions are sound under either theory. (See *In re R.T.* (2015) 232 Cal.App.4th 1284, 1301 [a court abuses its discretion when it applies an incorrect legal standard]; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281 [an evidentiary ruling that " ' "transgresses the confines of the applicable principles of law" ' " is an abuse of discretion].) With respect to the consequences of our evidentiary review, however, we will follow the tenet—correctly pointed out by both parties—that the erroneous exclusion of evidence by the trial court is not grounds for reversal unless we also determine that the error was prejudicial. (Evid. Code, § 354, subd. (a) [judgment shall not be reversed due to the erroneous exclusion of evidence unless the error resulted in a miscarriage of justice]; see also Cal. Const., art. VI, § 13 [same]; *Carnes*, *supra*, 126 Cal.App.4th at p. 694 [citing the constitutional provision].) Thus, the plaintiffs must demonstrate that, absent the error, "a different result would have been probable." (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th

14

1298, 1317 (*Pannu*).)  With these standards in mind, we turn to the particular evidence excluded by the trial court in this case.

### A.    *The Millette Deposition Testimony*

During his March 2007 deposition, Pierre Millette of Toyota Canada was questioned about the May 15, 2001, CADA meeting which he attended along with representatives of Ford Canada, AIAMC, CVMA, GM Canada, Chrysler Canada, CADA, and various local dealer associations.  Both Ford and Ford Canada objected on hearsay grounds to the following colloquy between counsel for the plaintiffs and Millette:  "Q.  Did CADA indicate that they would not support dealers who were involved in regular exporting of vehicles from Canada to the United States?  [¶] [Objection.]  [¶]  A.  I can remember comments being made that everyone supported the concept of trying to keep the vehicles in Canada, but who said what, on a general basis, I can't help you there.  [¶]  [Answer read back.]  [¶]  And that was your understanding that there was a general consensus that the vehicles would be kept in Canada, not be exported from Canada to the United States?  [¶]  [Objection.]  [¶]  A. There was general support for the approach."

Later in the deposition, counsel for Ford elicited this additional testimony from Millette, which it now also claims is inadmissible hearsay:  "Q.  Okay.  Was there any agreement, at that meeting or any time, to work together to keep vehicles in Canada?  [¶]  A.  I think that would be characterizing it as a little more than what it was.  It wasn't an agreement.  It was simply a concept that there was some consensus on from everyone at the meeting."  As Ford correctly notes, this discussion was immediately followed by an additional exchange to which no objection has been lodged.  Specifically Ford's attorney queried:  "Just to be clear in my question, did the participants in the meeting ever agree to work together to keep vehicles in Canada?"  Millette responded:  "No, absolutely not."

At the summary judgment hearing on January 24, 2011, after reference by GM Canada to Millette's statements, the trial court responded:  "I intentionally left out references to Mr. Millette.  I still haven't sorted out in my mind to what extent,

15

assuming Mr. Millette didn't testify at trial, anything that Mr. Millette said is admissible for any purpose." However, when discussing the Millette testimony at the continued hearing on May 10, 2011, in response to Ford's hearsay objection, the trial court stated: "I don't know if any of this is hearsay. It's all his understanding of what happened. No out-of-court statement offered for the truth. It's just what his understanding was."

Later in the hearing, plaintiffs' counsel and the trial court had an extended discussion regarding the admissibility of the Millette testimony. According to counsel for the plaintiffs, the hearsay rule was not implicated by the deposition testimony because "there are no other out-of-court statements here with the exception of Mr. Millette's testimony itself. There's no other—he is a percipient witness at a meeting. He perceives what happens at the meeting. He takes away an understanding of that. He is competent to testify about what he perceived at the meeting, that where before there wasn't a consensus and now there was, there was a consensus to keep the cars in Canada, to paraphrase Mr. Millette. He's not reporting about anything anyone else said." Again, the trial court seemed to agree, stating: "Well, that's what I think—my present view of that is that he is giving his understanding of what happened and that this is not hearsay." Nevertheless, when the trial court issued its written ruling on Ford's evidentiary objections in connection with its grant of summary judgment, the court sustained Ford's hearsay objections to both of the Millette deposition excerpts.

Initially, in considering the potential hearsay nature of the Millette statements, we note that Ford is not arguing that the challenged testimony is inadmissible hearsay because it is out-of-court deposition testimony. And, indeed, pursuant to section 2025.620 of the Code of Civil Procedure (section 2025.620), "[a]t the trial or any other hearing in the action, any part or all of a deposition may be used against any party who was present or represented at the taking of the deposition . . . so far as admissible under the rules of evidence applied as though the deponent were then present and testifying as a witness . . . ." (See *id.*, subd. (c)(1) [deposition testimony

16

may be used "for any purpose" where deponent resides more than 150 miles from the place of the trial]; see also Code Civ. Proc., § 437c, subd. (b)(1) [listing depositions among the documentation appropriate for use in support of a summary judgment motion].)  Moreover, in accordance with section 1291 of the Evidence Code (section 1291), "former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] [t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."  (Evid. Code, § 1291, subd. (a)(2).)  As with section 2025.620 testimony, however, the admissibility of former testimony under section 1291 is generally "subject to the same limitations and objections as though the declarant were testifying at the hearing."  (Evid. Code, § 1291, subd. (b).)  Thus, the question before us is whether Millette's testimony would constitute inadmissible hearsay if he were testifying as a witness in court.

Ford argues that the Millette statements at issue are indeed inadmissible on this basis because they "conveyed" hearsay.  Specifically, according to Ford, when the testimony is read in context, it is "clear Millette was describing *statements* made by the other participants in the meeting."  Ford contends that these out-of-court statements of other declarants are hearsay, and no exception to the hearsay rule has been offered justifying their admission.  We disagree.  None of the challenged testimony purported to recount "a statement," let alone to prove what was "stated."[11] Millette was not reporting particular statements made by particular participants. Rather, he was simply recounting generally his impressions and conclusions based on

---

[11] On appeal, plaintiffs do not challenge the trial court's exclusion of Millette's first statement—that he remembered "comments being made that everyone supported the concept of trying to keep the vehicles in Canada."  We therefore focus our review on the admissibility of his two subsequent statements and do not consider the first statement in our summary judgment analysis.

17

his participation in the meeting. This is not hearsay, and the trial court erred in concluding that it was.[12]

The more difficult question, however, is whether the trial court's evidentiary error was prejudicial such that it provides grounds for reversal of the court's grant of summary judgment in favor of Ford. (See Evid. Code, § 354, subd. (a); see also *Carnes*, *supra*, 126 Cal.App.4th at p. 694.) As stated above, to make a finding regarding prejudice we must determine whether, absent the error, " 'a different result would have been probable.' " (*Pannu*, *supra*, 191 Cal.App.4th at p. 1317.) In our view, this determination rests on two separate lines of inquiry. First, we must consider whether the Millette statements—improperly excluded on hearsay grounds—are otherwise admissible. Next, if they are admissible, we must resolve whether it is reasonably probable that their admission would have changed the outcome.

With respect to the admissibility of Millette's statements, the plaintiffs argue that the testimony is admissible nonhearsay because it was based on his "personal knowledge, which he gained from having participated in the May 15, 2001 meeting (and other conspiratorial meetings) on behalf of Toyota, alongside executives from Ford, GM, Chrysler and CADA." While this makes him *competent* to testify as to

---

[12] Although not necessary to our resolution of this matter, we note that if statements attributable to all of the other participants at the May 15 meeting were the basis for Millette's conclusion that a consensus had been reached to keep Canadian automobiles in Canada, then any such statements would likely themselves be admissible as admissions of co-conspirators, because they would have then been made while participating in a conspiracy and in furtherance of the objective of that conspiracy. (Evid. Code, § 1223.) Indeed, such statements could also be understood as operative facts, evincing the conspiratorial agreement itself, and therefore be deemed admissible as nonhearsay. (See 1 Witkin, California Evidence (5th ed. 2012) Hearsay, §§ 32-36, pp. 825-830.) Of course, logically, it is difficult if not impossible to reach any ultimate conclusion regarding how these alleged "statements" should be characterized as there is absolutely no evidence of who actually said what, a circumstance which underscores the inherent unworkability of Ford's "conveyed" hearsay theory.

18

facts he personally observed, it does not necessarily make admissible his inferences drawn from those facts. Rather, "[t]he *opinion rule*, which often rejects testimony of a competent witness because of the form in which the testimony is given, is distinct from the knowledge rule, which lays down a requirement of *competency of witnesses*. A witness is not competent to testify on a matter—either as to facts or opinions—if the witness lacks personal knowledge of it." (1 Witkin, Cal. Evidence (5th ed. 2012) Opinion Evidence, § 1, p. 608.) Thus, plaintiffs' argument does not go far enough, on its own, to justify the admission of the Millette statements.

Instead, we believe that the challenged deposition testimony is best understood as an opinion of a lay witness, admissible in accordance with section 800 of the Evidence Code (section 800).[13] That statute provides: "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of

---

[13] In November 2015, the parties were given the opportunity to file supplemental letter briefs addressing this theory of admissibility, along with certain others. Both did so, and we have considered their submissions in rendering our decision. In Ford's supplemental briefing, the automobile manufacturer argues that the plaintiffs' failure to specifically reference section 800—either in the trial court or on appeal—precludes any reliance on it. As described in detail above, however, Ford claimed in the trial court that the statements at issue are hearsay and the plaintiffs have argued strongly, both below and before this court, that they are not. We believe that this was more than sufficient to preserve the issue. Having agreed with the plaintiffs that the testimony is nonhearsay and was erroneously excluded, we consider section 800 only as part of our prejudice analysis. Indeed, even if further specificity were required to preserve the argument in this limited context, the plaintiffs claimed in their appellate briefing that "Mr. Millette used his senses to observe behavior at the meeting and form *an understanding* of what happened. He conveyed *his understanding* through his testimony." (Italics added.) And, before the trial court, plaintiffs similarly argued: "He perceives what happens at the meeting. He takes away *an understanding* of that. He is competent to testify about what he perceived at the meeting, that where before there wasn't a consensus [] now there was." (Italics added.) The trial court seemed to agree, stating: "My present view of that is that he is giving *his understanding* of what happened and that this is not hearsay." (Italics added.) Thus, plaintiffs have adequately raised the question of whether Mr. Millette could properly testify as to his understanding or opinion regarding the events at issue.

his testimony." (Evid. Code, § 800.) A trial court has broad discretion to admit lay opinion testimony, especially where adequate cross-examination has been allowed. (*Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 112 (*Osborn*).)

Our Supreme Court has recently summarized the law regarding lay opinions under section 800 as follows: " 'A lay witness may express an opinion based on his or her perception, but only where helpful to a clear understanding of the witness's testimony (Evid. Code, § 800, subd. (b)), "i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed." [Citation.]' [Citation.] Such a situation may arise when a witness's impression of what he or she observes regarding the appearance and demeanor of another rests on 'subtle or complex interactions' between them [citation] or when it is impossible to otherwise adequately convey to the jury the witness's concrete observations. [Citations.] A lay witness generally may not give an opinion about another person's state of mind, but may testify about objective behavior and describe behavior as being consistent with a state of mind. [Citation.]" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 130–131 (*DeHoyos*).)

Put another way, the opinion rule for nonexperts " 'merely requires that witnesses express themselves at the lowest possible level of abstraction. [Citation.] Whenever feasible "concluding" should be left to the jury; however, when the details observed, even though recalled, are "too complex or too subtle" for concrete description by the witness, he may state his general impression.' " (*Angelus Chevrolet v. State of California* (1981) 115 Cal.App.3d 995, 1001 (*Angelus Chevrolet*).) Thus, for example, "a lay witness may express an opinion that a person was 'drunk' [citation], or that people engaged in a discussion were 'angry' [citation], or that an impact was strong enough to jar a passenger from a seat [citation], or that someone appeared to be 'trying to break up a fight.' [Citation.]" (*Osborn*, *supra*, 224 Cal.App.3d at p. 113.) Where a lay opinion is otherwise admissible, the witness's experience may affect the weight of the testimony. (See *People v. McAplin* (1991) 53 Cal.3d 1289, 1307.)

20

We find Justice Werdegar's recent opinion in *Seumanu, supra,* 61 Cal.4th 1293, particularly useful. In that case, a murder defendant (Ropati) presented testimony at trial from his brother (Tautai) claiming that he—Tautai—was the one who killed the victim rather than Ropati. (*Id.* at pp. 1303, 1306.) To counteract this testimony, the prosecution presented evidence from a third crime partner, Iuli, who had pleaded guilty to reduced charges and agreed to testify for the prosecution. (*Id.* at pp. 1304, 1309–1310.) In particular, Iuli described a pretrial encounter he had when he, Tautai, and Ropati were together in a holding cell. Iuli testified that Ropati "asked him and Tautai to 'take the blame off of him and that he would be out there taking care of us' by sending them money in prison." (*Id.* at p. 1309.) Iuli rejected the proposal, but stated that Tautai "remained silent and did not appear angry." (*Ibid.*) Follow-up questions indicating that Iuli thought Tautai looked like he was going to take the blame were objected to as improperly calling for an opinion. (*Id.* at p. 1310.) However, under these circumstances, the *Seumanu* Court concluded that "Iuli's testimony regarding his perceptions was not improper opinion evidence from a lay witness." (*Ibid.*) Rather, "Iuli was a percipient witness to the encounter in the holding cell and he thus spoke from personal knowledge gleaned from his own participation in, and observation of, the event in question." (*Id.* at p. 1311.)

Similarly, in this case, Millette was a percipient witness to the May 15, 2001, meeting, and his opinion was based on personal knowledge gleaned from his own participation in, and observation of, that interaction, as well as his numerous previous contacts with the alleged co-conspirators. (Cf. *Seumanu, supra,* 61 Cal.4th at pp. 1309–1311.) Further, it is quite likely that his conclusions were based, at least in part, on observations regarding the appearance and demeanor of other meeting participants and rested on the " 'subtle or complex interactions' " among them. (*DeHoyos, supra,* 57 Cal.4th at pp. 130–131; see also *People v. Hinton* (2006) 37 Cal.4th 839, 889 [lay opinion by third party that a defendant was directing another individual in a drug transaction may be proper where it is "certainly possible" that the third party's impression "rested on subtle or complex interactions . . . that were

21

difficult to put in words"]*; Angelus Chevrolet*, *supra*, 115 Cal.App.3d at p. 1001.)
Moreover, there is no indication in the record that Millette was able to recall any
particular statements or actions by any of the meeting participants. Thus, his
comments were useful to understanding what transpired at this all-important meeting
because the concrete observations on which his opinion was based likely could not
otherwise be conveyed. (See *DeHoyos*, *supra*, 57 Cal.4th at pp. 130–131.) Under
such circumstances, he was testifying at the " 'lowest possible level of abstraction.' "
(*Angelus Chevrolet*, *supra*, 115 Cal.App.3d at p. 1001.) In sum, although Millette
could not properly testify as to the actual state of mind of any of the other meeting
participants, he was allowed to express his opinion that they behaved in a way
consistent with reaching a consensus to restrict exports. (See *DeHoyos*, *supra*, 57
Cal.4th at pp. 130–131.) His challenged testimony is therefore properly admissible
in accordance with section 800.[14]

Having determined that the testimony at issue is admissible, we next consider
the second prong of our prejudice analysis: whether consideration of that evidence,
in conjunction with the other admissible evidence presented by the plaintiffs, would
likely have led to a different outcome. We believe that, with respect to Ford
Canada's summary judgment motion, it is probable that it would have. We discuss
this conclusion in detail below, in the context of our review of the plaintiffs'
conspiracy evidence as it relates to Ford Canada. In sum, plaintiffs' entire case
stands or falls on whether they have presented sufficient admissible evidence of an
illegal agreement to restrict Canadian exports. Unsurprisingly, there is no
unambiguous evidence of such an agreement in the record before us. However, Mr.
Millette's statements are important evidence suggesting conspiracy and could clearly

---

[14] Ford repeatedly urges us to defer to the trial court's exercise of discretion in this case.
However, because the trial court made a legal error—characterizing nonhearsay as
hearsay—it never exercised its discretion with respect to whether the testimony at issue
was otherwise admissible. If anything, though, the court's comments seem to indicate
that it properly understood Millette's statements for what they are: His *understanding* of
what happened at the May 2001 meeting.

have tipped the balance in the plaintiffs' favor. In short, based on his testimony, a reasonable juror could conclude that—at least in the mind of one of the key alleged co-conspirators—all of the participants at the May 15, 2001, CADA meeting had reached a consensus to keep Canadian automobiles in Canada. Under these circumstances, exclusion of the Millette statements was not only erroneous, but also prejudicial.

**B.** *The CADA Minutes of the May 2001 Meeting*

After the May 15, 2001, meeting discussed in the Millette testimony, Melissa Clark—a CADA employee who attended the meeting—drafted minutes based on her handwritten notes. The document indicates that it is "confidential notes" from the "Export Sales Meeting" held on May 15, 2001, and lists the individuals from Ford Canada, Toyota Canada, AIAMC, CVMA, GM Canada, Chrysler Canada, CADA, and various local dealer associations who participated. According to the minutes, after a CADA representative articulated the meeting objective of "developing a strategy to solve the industry problem of export sales," the meeting participants discussed the pros and cons of various ways they could work together to make export restraints more effective. The minutes also include a laundry list of proposed follow-up actions, such as obtaining industry-wide statistics on the size of the export problem and seeking "advice from outside counsel with respect to any Competition Act implications of any industry-wide export sales initiatives." They end with the admonition: "**PLEASE KEEP THESE NOTES CONFIDENTIAL**."

In connection with its summary judgment motion, Ford objected to the admission of the Export Sales Meeting minutes on hearsay grounds and to certain statements of CADA representatives memorialized in those minutes as multiple hearsay. In response, the plaintiffs argued that the minutes were admissible under numerous exceptions to the hearsay rule, including the business record exception (Evid. Code, § 1271), the exception for adoptive admissions (Evid. Code, § 1221), and the co-conspirator exception (Evid. Code, § 1223). In the end, however, the trial court sustained Ford's hearsay objection. On appeal, the plaintiffs renew their

23

argument that the meeting minutes are properly admissible, both as a business record and as an adoptive admission of Ford Canada.

We agree with the plaintiffs that the meeting minutes here at issue are a "textbook example" of an adoptive admission of Ford Canada under section 1221 of the Evidence Code (section 1221).  Pursuant to section 1221,  " '[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth.'  The theory of adoptive admissions expressed in section 1221 ' "is that the hearsay declaration is in effect repeated by the party; his conduct is intended by him to express the same proposition as that stated by the declarant." ' " (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 326; see also *People v. Hayes* (1999) 21 Cal.4th 1211, 1257 ["[t]he hearsay rule does not bar evidence offered against a party who has admitted the *truth* of the hearsay statement"]; *People v. Osuna* (1969) 70 Cal.2d 759, 765 (*Osuna*) [conversation among codefendants admitted under adoptive admission rule where "[h]ad one disagreed with what the other said, it is reasonable to assume that he would have said so"].)

In the instant case, after Melissa Clark of CADA drafted the meeting minutes, she forwarded them to Norm Stewart—Vice President of Government Relations and General Counsel for Ford Canada—for his review and comment.  According to Stewart, he made a few comments that weren't "super substantive" and sent the revised minutes back to Clark.  Stewart also stated that he felt that the minutes "generally captured the sense of what went on at the meeting" and were "pretty accurate."  Indeed, the only complaint he was able to articulate was that he "didn't think" the minutes "totally accurately recaptured the concept that issues were put out, but not necessarily brought to closure," an idea which, in our view, is adequately conveyed within the document.  In sum, by engaging in this review and revision process, Stewart (on behalf of Ford Canada) clearly manifested his belief in the accuracy of the meeting minutes.  Presumably, had he seen any errors, he would have

corrected them. (*Osuna*, *supra*, 70 Cal.2d at p. 765.) Thus, the minutes were admissible against Ford Canada as an adoptive admission and were erroneously excluded by the trial court.

On appeal, Ford does not challenge the plaintiffs' characterization of the meeting minutes as adoptive admissions. Instead, it argues only that the plaintiffs were not prejudiced by the exclusion of the minutes because evidence of the "content of the discussion at the CADA meeting" was "plainly before the court." Moreover, according to Ford, the minutes do not support an inference of conspiracy because the meeting participants never adopted any of the specific actions proposed on May 15. As we discuss further below, we do not find the failure of the alleged co-conspirators to implement any of the joint actions suggested at the May 15 meeting to be particularly relevant to the existence of plaintiffs' claimed conspiracy. Moreover, we doubt that being aware of the gist of what was discussed at the meeting has the same impact as viewing an official document which sets forth the names of each alleged co-conspirator; indicates the willingness of each to discuss at length engaging in patently anti-competitive behavior; evinces knowledge by the participants of the possible anti-competitive nature of their pursuits; and requests that confidentiality be maintained. However, ultimately, we need not decide the issue of prejudice because—irrespective of our proper consideration of the minutes as part of our de novo review—we would reverse the trial court's grant of summary judgment in favor of Ford Canada for the other reasons stated herein. Because we do not rely on the improper exclusion of the minutes as a basis for reversal, we need not determine whether that exclusion was prejudicial.

Having resolved these preliminary matters, we turn now to the sufficiency of the plaintiffs' conspiracy evidence.

## III. SUMMARY JUDGMENT ON EXISTENCE OF AGREEMENT

### A. *Analytical Framework and Standard of Review*

The standards for granting summary judgment are well-settled and easily delineated. A trial court must grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) When, as here, defendants move for summary judgment, they can "meet their burden by demonstrating that 'a cause of action has no merit,' which they can do by showing that '[o]ne or more elements of the cause of action cannot be separately established . . . .' [Citations.] Once defendants meet this burden, the burden shifts to plaintiff to show the existence of a triable issue of material fact." (*Nazir*, *supra*, 178 Cal.App.4th at p. 253.) The initial burden of a defendant moving for summary judgment is a "burden of production to make a prima facie showing of the nonexistence of any triable issue." (*Aguilar, supra,* 25 Cal.4th 826, 850.) Thus, such a defendant is only required to present some evidence creating a rebuttable presumption that no material fact issue exists before the burden shifts to the plaintiff opposing the motion. (*Id.* at pp. 850–851.)

Our review of an order granting summary judgment is de novo. Under such circumstances, the trial court's stated reasons for granting summary judgment "are not binding on us because we review its ruling, not its rationale." (*Ram's Gate Winery. LLC v. Roche* (2015) 235 Cal.App.4th 1071, 1079.) Thus, "[t]he sole question properly before us on review of the summary judgment is whether the judge reached the right *result* . . . whatever path he might have taken to get there." (*Carnes*, *supra*, 126 Cal.App.4th at p. 694.)

In undertaking our analysis, we " 'accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them.' " (*Nazir*, *supra*, 178 Cal.App.4th at p. 254.) We must, however, disregard any evidence to which objections have been made and sustained. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*); Code Civ. Proc., § 437c,

subds. (b)(5), (c) & (d).)  Finally, as an overarching principle, we view the evidence in the light most favorable to the losing party—here the plaintiffs—liberally construing the plaintiffs' evidentiary submissions and strictly scrutinizing the defendants' evidence in order to resolve any evidentiary doubts or ambiguities in the plaintiffs' favor.  (*Cheal v. El Camino Hospital* (2014) 223 Cal.App.4th 736, 741; *Nazir*, *supra*, 178 Cal.App.4th at p. 254.)

In addition to these general tenets regarding motions for summary judgment, our Supreme Court in the seminal case of *Aguilar, supra,* 25 Cal.4th 826, set forth guidance specifically applicable to summary judgment motions in antitrust actions for unlawful conspiracy.  (*Id.* at p. 843.)  In *Aguilar*, plaintiffs argued that nine petroleum companies had violated the Cartwright Act by "enter[ing] into an unlawful conspiracy to restrict the output of CARB [California Air Resources Board cleaner-burning] gasoline and to raise its price."  (*Id.* at pp. 837–839.)  While concluding that summary judgment was appropriate on the facts before it, the *Aguilar* court clarified "the law that courts must apply in ruling on motions for summary judgment, both in actions generally and specifically in antitrust actions for unlawful conspiracy."  (*Id.* at pp. 842–843.)

With respect to antitrust conspiracy cases in particular, the *Aguilar* court—after reviewing recent state and federal law on the subject[15]—opined:  "On the defendants' motion for summary judgment, in order to carry a burden of production to make a prima facie showing that there is a triable issue of the material fact of the existence of an unlawful conspiracy, a plaintiff, who would bear the burden of proof by a preponderance of evidence at trial, must present evidence that would allow a reasonable trier of fact to find in his favor on the unlawful-conspiracy issue by a

---

[15] "In antitrust actions brought under the Cartwright Act, we look to interpretations of its federal law counterpart, the Sherman Antitrust Act (15 U.S.C. § 1 et seq.), for guidance since the federal act was a model for our own in most respects."  (*Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1420 (*Biljac*), overruled on other grounds as stated in *Reid*, *supra*, 50 Cal.4th at p. 532 & fn. 8.)

preponderance of the evidence, that is, *to find an unlawful conspiracy more likely than not*. Ambiguous evidence or inferences showing or implying conduct that is as consistent with permissible competition by independent actors as with unlawful conspiracy by colluding ones do not allow such a trier of fact so to find." (*Aguilar*, *supra*, 25 Cal.4th at p. 852, italics added; see also *Matsushita Elec. Industrial Co. v. Zenith Radio* (1986) 475 U.S. 574, 588 (*Matsushita)*.) Thus, an antitrust plaintiff must also "present evidence that tends to exclude, although it need not actually exclude, the possibility that the alleged conspirators acted independently rather than collusively." (*Aguilar*, *supra*, 25 Cal.4th at p. 852; see also *Matsushita*, *supra*, 475 U.S. at p. 588.) "Insufficient is a mere assertion that a reasonable trier of fact might disbelieve any denial by the defendants of an unlawful conspiracy." (*Aguilar*, *supra*, 25 Cal.4th at p. 852.)

When attempting to prove unlawful conspiracy, antitrust plaintiffs may rely on both direct and circumstantial evidence. " ' "[D]irect evidence" ' means evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact." (*Biljac*, *supra*, 218 Cal.App.3d at p. 1430 [quoting Evid. Code, § 410].) An inference, in contrast, is " ' "a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." ' " (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1529, quoting Evid. Code, § 600, subd. (b).) As the *Aguilar* court acknowledged, antitrust plaintiffs "must often rely on inference rather than evidence since, usually, unlawful conspiracy is conceived in secrecy and lives its life in the shadows." (*Aguilar*, *supra*, 25 Cal.4th at p. 858.)

Whether direct evidence or inference, however, "if the court determines that any evidence or inference presented or drawn by the plaintiff indeed shows or implies unlawful conspiracy *more likely than* permissible competition, it must then deny the defendants' motion for summary judgment, even in the face of contradictory evidence or inference presented or drawn by the defendants, because a reasonable trier of fact could find for the plaintiff." (*Aguilar*, *supra*, at pp. 856–857.)

28

In addition, *Continental Ore Co. v. Union Carbide* (1962) 370 U.S. 690, 699 (*Continental Ore*) teaches that plaintiffs in an antitrust action for unlawful conspiracy "should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." Thus, " '[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.' " (*Ibid.*)

With respect to the substantive law of conspiracy, while some sort of concerted activity is necessary for an antitrust claim, it is well settled that an explicit or formal agreement is not required. (*United States v. General Motors Corp.* (1966) 384 U.S. 127, 142–143 (*General Motors*); *Biljac*, *supra*, 218 Cal.App.3d at p. 1423.) In *General Motors*, for instance, the United States Supreme Court found sufficient evidence of conspiracy under the federal antitrust laws where General Motors worked with a number of its dealers and local dealer associations, to "persuade" a subset of dealers to agree not to sell Chevrolets through certain discount houses.[16] (*General Motors*, *supra*, 384 U.S. at pp. 130–131, 134–138.) In rejecting the trial court's conclusion that each alleged co-conspirator was engaging solely in parallel action in furtherance of its own self-interest rather than acting pursuant to an illegal agreement, the Supreme Court opined: "[I]t has long been settled that explicit

---

[16] Other cases considering conspiracy allegations in the context of cutting off a discount channel of distribution include *Coca-Cola Co. v. Omni Pacific Co., Inc.* (N.D. Cal. 2000) 2000 U.S. Dist. LEXIS 17089 (*Coca-Cola*) (sufficient evidence to survive summary judgment on claim of illegal horizontal conspiracy between Coca-Cola and its competitors to eliminate exporters selling lower-priced U.S. beverages into higher-priced foreign markets based on exchanges of information regarding those exporters), *Toys "R" Us, Inc. v. F.T.C.* (7th Cir. 2000) 221 F.3d 928 (*Toys "R" Us*) (agreements between Toys "R" Us and toy manufacturers to restrict sales to a discount competitor of Toys "R" Us constitute illegal horizontal conspiracy where toy manufacturers would not enter into agreements without assurances that other manufacturers were also bound), and *Alvord-Polk, Inc. v. F. Schumacher & Co.* (3d Cir. 1994) 37 F.3d 996, 1005–1006, 1013–1014 (*Alvord-Polk*) (evidence insufficient to prove conspiracy among wall-covering manufacturers to restrict sales by discount 800-number dealers).

agreement is not a necessary part of a Sherman Act conspiracy—certainly not where, as here, joint and collaborative action was pervasive in the initiation, execution, and fulfillment of the plan." (*Id.* at pp. 142–143.) Rather, to maintain an actionable antitrust claim, "[c]ircumstances must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.' " (*Monsanto Co. v. Spray-Rite Service Corp.* (1984) 465 U.S. 752, 764 (*Monsanto*).) Thus, as the *Biljac* court put it in the context of a Cartwright Act claim, all that is required from an antitrust plaintiff is " 'direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others "had a conscious commitment to a common scheme designed to achieve an unlawful objective." ' " (*Biljac*, *supra*, 218 Cal.App.3d at pp. 1425–1426, quoting *Monsanto*, *supra*, 465 U.S. at p. 764.)

In attempting to prove unlawful conspiracy, one type of evidence antitrust plaintiffs often present—as the plaintiffs do here—is evidence that the alleged co-conspirators met and shared industry information at conferences or trade association meetings. The law is clear, however, that "[i]n general, trade association activities tend to promote competition and are lawful. Gathering and compiling industry information and disseminating it among members does not offend antitrust policy, even though to do so naturally 'tends to stabilize that trade or business and to produce uniformity of price and trade practice.' " (*Biljac*, *supra*, 218 Cal.App.3d at p. 1430, quoting *Maple Flooring Assn. v. United States* (1925) 268 U.S. 563, 582 (*Maple Flooring*).) Moreover, trade association members do not " 'become . . . conspirators merely because they gather and disseminate information . . . bearing on the business in which they are engaged *and make use of it in the management and control of their individual businesses . . . .*' " (*Biljac* at p. 1430, quoting *Maple Flooring*.) "[O]nly when they take *concerted action to restrain trade* based on such information do they act illegally." (*Ibid.*, citing *Maple Flooring*.)

Thus, for instance, in *Biljac*, the plaintiffs argued the existence of a conspiracy to manipulate variable interest rates on certain loans. (*Biljac*, *supra*, 218 Cal.App.3d at p. 1415.) In support of their position, the *Biljac* plaintiffs pointed to

30

evidence that interest rates and interest-rate pricing were topics of discussion at trade association meetings. This, however, was deemed insufficient to prove the existence of the claimed conspiracy. (*Id.* at p. 1430.) Specifically, the *Biljac* court concluded that no inference of conspiracy could be drawn from industry discussions of this nature "without proof of agreement or concerted action to manipulate the . . . market with such information." (*Ibid.*) Put another way, the *Biljac* plaintiffs' proof failed because "further inferences" were required "to conclude that any *agreement* or *consensus* came out of those discussions." (*Ibid.; s*ee *Aguilar*, *supra*, 25 Cal.4th at pp. 839–840, 862–863 [concluding that the gathering and dissemination of pricing information by the petroleum companies through an independent industry service did not imply collusive action where there was no evidence the information was misused as a basis for an unlawful conspiracy; rather, evidence suggested that individual companies used all available resources "to determine capacity, supply, and pricing decisions which would maximize their own individual profits" ]; see also *In re Citric Acid Litigation* (9th Cir. 1999) 191 F.3d 1090, 1097–1099 [insufficient evidence that defendant was part of price-fixing conspiracy where there was no evidence illegal activities took place at trade association meetings attended by the defendant; further, gathering information about pricing and competition in the industry was a legitimate function of the trade association]; *Alvard-Polk*, *supra*, 37 F.3d at pp. 1005–1006, 1013–1014 [evidence insufficient to prove conspiracy among wall-covering manufacturers to restrict sales by discount dealers where discussion of issue and possible responses to it at conventions was an information exchange only, providing no evidence of an illegal agreement].)

Finally, as we conduct our review of these proceedings, we are also mindful that "both California and federal decisions urge caution in granting a defendant's motion for summary judgment in an antitrust case." (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 321 (*Fisherman's Wharf*).) As the United States Supreme Court stated in *Poller v. Columbia Broadcasting* (1962) 368 U.S. 464, 473: "We believe that summary procedures should be used sparingly

31

in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." (See also *Corwin v. Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 852 [quoting *Poller* with approval]; *Fisherman's Wharf*, *supra,* 114 Cal.App.4th at p. 321 [same].) The *Aguilar* court acknowledged as much. (*Aguilar*, *supra*, 25 Cal.4th at p. 852.) However, it went on to opine that the presumption that such a motion should be granted " 'sparingly' does *not* mean 'seldom if ever.' Hence, although such motions should be denied when they should, they must be granted when they must." (*Id.* at pp. 847, 852.) On this relatively unhelpful note, we turn to our review of the conspiracy evidence presented by the plaintiffs in the instant case.

## B.     *Sufficiency of the Conspiracy Evidence:  Ford U.S.*

We consider first whether the evidence submitted by the plaintiffs is sufficient to raise a triable issue of material fact with respect to Ford U.S.'s participation in the alleged conspiracy to restrict Canadian exports. Specifically, under *Aguilar*, we ask whether it is more likely than not—on the evidence presented—that Ford U.S. entered into an illegal agreement with any other alleged co-conspirator to restrict the export of Canadian vehicles into the United States. As a preliminary matter, we acknowledge the authority cited by Ford for the proposition that a corporation and its wholly owned subsidiary are incapable of conspiring under the antitrust laws. (See *Copperweld Corp. v. Independence Tube Corp.* (1984) 467 U.S. 752, 769–771 (*Copperweld*); *Freeman v. San Diego Association of Realtors* (1999) 77 Cal.App.4th 171, 189.) As the United States Supreme Court explained in *Copperweld*: "[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of [section] 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With

32

or without a formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do 'agree' to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for [section] 1 scrutiny." (*Copperweld*, *supra,* 467 U.S. at p. 771.) In fact, the plaintiffs here acknowledge that they are not arguing that Ford U.S. is liable because it conspired with its subsidiary, Ford Canada. Thus, in reviewing the materials the plaintiffs contend establish Ford U.S.'s participation in the alleged conspiracy, evidence that Ford U.S. and Ford Canada were working together to combat the export of Canadian vehicles to the United States proves nothing more than unilateral action by Ford in response to a perceived threat.

Nevertheless, in an attempt to meet their burden under *Aguilar*, plaintiffs point first to a collection of materials prepared in advance of a November 2001 meeting between Ford U.S. and Ford Canada on the issue of unauthorized Canadian exports, referred to in the documents as "Canadian brokering." The record contains three different iterations of an agenda or talking points for this anticipated "Canadian Brokering Summit," which were prepared by Ford U.S. and make clear that the company was concerned about the Canadian export issue from a dealer relations standpoint. Specifically, Ford U.S. was receiving a substantial number of complaints from their U.S. dealers regarding unfair competition from Canadian exports being sold as "new" within their franchise areas. The issue was particularly contentious with respect to Thunderbirds, a "high-profile, high-margin vehicle." In addition, Canadian brokering was problematic for Ford U.S. because it was costing them money. Indeed, according to the materials, Ford U.S. was making "as much as $5000 less on some vehicles which [were] sold in Canada and then brokered, compared to what [they] would have earned had the vehicle gone directly to a US dealer."

Attached to the agenda was a list of suggested actions that could be taken to help solve the export problem, including the pros and cons of each. For instance,

Ford U.S. suggested adding a unique character to Canadian VIN's to make the Canadian vehicles easier to track. Another proposal was to cancel the sale of an exported vehicle, charge back the Canadian dealer who sold it, and then re-report the sale using the appropriate U.S. dealer code. None of the proposed action items, however, suggested or required the involvement of any other manufacturer; nor did any of the agenda materials mentioned above discuss coordination with competitors. Indeed, plaintiffs conceded as much below, but argued that the documents show that Ford U.S. exercised "a modicum of control" and directed Ford Canada on the issue of exports. To the contrary, we view these materials as revealing only that Ford U.S. had identified what it saw as a significant problem and was looking to Ford Canada to help solve it. There is certainly no evidence that Ford Canada was acting as an authorized agent of Ford U.S. for purposes of entering into an unlawful conspiracy. (See *United States v. Bestfoods* (1988) 524 U.S. 51, 61 (*Bestfoods*) [a parent corporation generally "is not liable for the acts of its subsidiaries"]; see also *In re Capacitors Antitrust Litigation* (N.D. Cal. 2015) 106 F.Supp.3d 1051, 1071 [quoting *Bestfoods* in dismissal of parent corporation from antitrust action where there were no allegations that the parent company, itself, participated in the alleged conspiracy].)

The plaintiffs also claim that Ford U.S. was likely part of the alleged conspiracy because it was the primary beneficiary of the export restrictions, which allowed the manufacturer to sell its U.S. vehicles at a premium. The evidence does reveal that Ford U.S. possessed a motive to conspire. Reportedly, for instance, the consensus at the November 2001 Canadian Brokering Summit was that between 500 and 700 Ford vehicles per month were being brokered from Canada to the United States at that time. As stated above, Ford was losing as much as $5000 on each Canadian brokered sale. Indeed, in considering the situation, Bill Glick, a Ford U.S. executive, opined: "There still appears to be a substantial revenue/profit opportunity for the Company if we can effectively address the Canadian brokering situation." In line with this conclusion, Ford U.S. generated a list of proposed follow-up actions

34

after the November 2001 meeting which included: redefining "new vehicle" as having less than a certain number of miles; working toward eliminating the Canadian tax rebate (GST) for exported vehicles; rewriting buyer orders to be cancelable if the buyer is determined to be a broker; increasing manpower to audit dealerships; reviewing competitive procedures regarding warranties (especially Honda's); providing feedback to dealers on actions taken; engaging a consultant to study the brokering issue and recommend solutions; and investigating specific brokering activity involving Hertz as well as the brokering of Ford Thunderbirds. Again, however—other than collecting information regarding competitors' warranty procedures—none of these proposed actions mentioned involvement of, or coordination with, competitors.[17] Moreover, although the evidence may show that Ford U.S had motive to conspire with other automobile manufacturers to restrict Canadian exports, this, without more, is insufficient to prove conspiracy. (See *Aguilar*, *supra*, 25 Cal.4th at p. 864 ["We recognize that Aguilar did indeed present evidence that the petroleum companies may have possessed the motive, opportunity, and means to enter into an unlawful conspiracy. But that is all. And that is not enough"].) In sum, nothing in the Canadian Brokering Summit materials "tends to exclude" the possibility that Ford U.S. was acting independently and in its own self-interest, rather than collusively with other alleged co-conspirators. (*Aguilar*, *supra*, 25 Cal.4th at p. 852.)

In addition, however, plaintiffs point to several emails they claim are evidence that Ford U.S. "was involved with and approved of communications with competitors." The first is a December 1999 email from a Ford Canada executive to Ford U.S. stating that he had been in touch with his "contact" at Honda Canada, who reported the use of export controls very similar to those used by Ford Canada. The email additionally mentions that Honda Canada had been voiding warranties, but had

---

[17] We discuss below the insufficiency of information gathering from competitors as a basis for establishing antitrust liability.

35

been receiving a significant amount of "push back" from relocated Canadian consumers and U.S. customers who had unknowingly purchased gray market vehicles. The second email was written by a Ford U.S. executive, Bill Glick, in March 2002 and indicates that representatives of Ford U.S. had learned from a former Ford employee working for Chrysler that Chrysler was considering voiding warranties. With respect to the Ford Canada email, there is no indication that Ford U.S. either solicited or approved of Ford Canada's collection and dissemination of industry information from Honda Canada. More importantly, though, both emails fail to go beyond information gathering from competitors regarding an industry problem, activity that is condoned under the antitrust laws. (See *Biljac*, *supra*, 218 Cal.App.3d at p. 1430 [industry participants do not " 'become . . . conspirators merely because they gather and disseminate information . . . bearing on the business in which they are engaged *and make use of it in the management and control of their individual businesses . . .*' "].) Thus, these emails do little to prove unlawful collusion.

The only other conspiracy evidence identified by the plaintiffs involving Ford U.S. is a March 2002 internal Ford U.S. memorandum written by Bill Glick. In that document, Bill Glick stated: "[P]lease note that Dave Kelleher [an in-house attorney for Ford U.S.] has calls into his counterparts at DCX [DaimlerChrysler U.S.] and GM to discuss potential industry-wide solutions." Plaintiffs contended in the trial court that this evidence alone showed Ford U.S. "actively participating in the conspiracy."

However, even assuming the calls were made—a fact disputed below—there is no indication in this statement that Ford U.S. did anything more than make initial contact with certain competitors to discuss an industry issue. Further—in contrast to the meeting evidence discussed below where numerous alleged co-conspirators accepted an invitation to meet knowing that the sole topic of discussion would be the development of an industry-wide solution to the Canadian export problem—there is no indication here that Ford U.S.'s competitors were even willing to talk about these

issues. Under such circumstances, there is simply no evidence, or even inference, from which a reasonable jury could conclude that Ford U.S. agreed with any other alleged co-conspirator to do something together about the export problem or that it even understood the goals of the alleged conspiracy and actively participated in it. (See *Biljac*, *supra*, 218 Cal.App.3d at pp. 1425–1426; see also *In re TFT-LCD (Flat Panel) Antitrust Litigation* (N.D. Cal. 2008) 586 F.Supp.2d 1109, 1117 ["the heart of an antitrust conspiracy is an agreement and a *conscious decision by each defendant to join it,*" italics added]; *ibid.* [finding general allegations against all corporate entities in a single corporate structure insufficient under federal antitrust law; leave to amend granted to more specifically plead how each individual corporate defendant joined the alleged conspiracy].) This single email, then, is manifestly not enough to raise a triable issue of material fact as to whether Ford U.S. unlawfully conspired with its competitors in violation of the Cartwright Act. (See *Aguilar*, *supra*, 25 Cal.4th at p. 852.) Thus, with respect to Ford U.S., the trial court's grant of summary judgment was proper.

### C.      *Sufficiency of the Conspiracy Evidence:  Ford Canada*

A summary judgment determination with respect to Ford Canada, however, is less straightforward. Indeed, the record in this matter—including deposition testimony, declarations, expert opinions, interrogatories, requests for admission, and related document production—is factually complex and fills more than 26,000 pages. Because we need only identify evidence sufficient to establish the existence of one issue of material fact in order to reverse the trial court's grant of summary judgment in favor of Ford Canada, however, we need not engage in an exhaustive recitation of all of the potentially relevant evidence presented below.

Moreover, we note that, in ruling on Ford Canada's summary judgment motion, the trial court excluded vast amounts of potentially highly relevant evidence related to Ford Canada's alleged co-conspirators on hearsay grounds, presumably concluding that the plaintiffs had failed to make the prima facie showing necessary for application of the co-conspirator exception to the hearsay rule. (See Evid. Code,

37

§ 1223.) Since, on appeal, the plaintiffs have only challenged the trial court's rejection of the two pieces of evidence discussed above, we will not consider the remainder of the excluded materials in reaching our decision. (*Biljac*, *supra*, 218 Cal.App.3d at p. 1420 [failure to raise issue on appeal constitutes abandonment]; see also *Guz*, *supra*, 24 Cal.4th at p. 334 [evidence to which objections have been made and sustained must be disregarded on review of summary judgment].) Finally, since the plaintiffs have not contested the trial court's conclusion that Ford Canada met its initial burden of production, making—through general denials of wrongdoing; proof of prior consistent conduct; and evidence of independent business reasons for its actions—a prima facie showing of the absence of any conspiracy, we will not here revisit that determination.

Rather, we are left solely with the question of whether the plaintiffs have carried the burden of production, as shifted onto their shoulders, to make a prima facie showing of the presence of an illegal agreement among the named defendants to curb Canadian exports. In the words of the trial court, we explore whether plaintiffs produced evidence "that tends to exclude the possibility that the defendants acted independently rather than collusively." We believe that the plaintiffs have produced such evidence in an amount sufficient to defeat Ford Canada's bid for summary judgment.

Preliminarily, however, we note that there is some evidence which, although stressed by one party or the other, is not particularly helpful in resolving the question before us. For instance, we do not believe the fact that some or all of the relevant automobile manufacturers, including Ford, might have engaged in unilateral activities designed to curtail Canadian exports in the decades preceding the alleged conspiracy period negates the possibility of unlawful collusive action during that period. Rather, as the trial court correctly noted,[18] entering into an anti-competitive

---

[18] Specifically, the trial judge opined: "I think the law is that if you're doing something parallel without concerted effort and then at some point you go into—you enter into an arrangement, an agreement, by which you say we're going to keep doing this and now

38

agreement not to stop doing what you previously may have had the ability to do on your own is sufficient for purposes of liability under the Cartwright Act. (See *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 41-43, 49-50 (*Quelimane*).)

For example, *Quelimane* involved an alleged conspiracy under the Cartwright Act among title insurers who refused to sell title insurance on real property acquired through a tax sale. (*Quelimane*, supra, 19 Cal.4th at p. 48.) Our Supreme Court determined that the allegations in the complaint were not subject to demurrer despite the fact that "an insurer may lawfully and individually conclude that the risks inherent in insuring a title to property conveyed by tax deed outweigh the potential benefit and decline to issue title insurance to purchasers of tax-deeded property." (*Id.* at p. 49.) The high court reached this conclusion because "[r]ecognition that a single participant in the market might refuse to insure tax deed titles for a legitimate business reason does not demonstrate that there is 'a purpose unrelated to elimination or reduction of competition' [citation] for *an agreement* by a combination of insurers to refuse such policies. . . ." (*Id.* at pp. 49-50, italics added.)

Rather, "an agreement among all title insurers in a county that none will issue policies on property conveyed by tax deed . . . implies a purpose of *ensuring that none will seek what might otherwise become a sufficiently lucrative business opportunity to outweigh the risk*. (*Id.* at p. 50, italics added.) In sum, "[w]hile refusing to sell a product to a consumer does not itself violate the Cartwright Act, when that refusal is the result of a combination, agreement, or conspiracy to make that product unavailable in a given market a prohibited restraint of trade may be

we're all going to do it together like we were before, but we're going to keep doing this, maybe step up our—but we promise we won't stop. I think that's enough to get to a jury as a matter of law. I think that is covered by the Cartwright Act." In the end, however, the trial court described plaintiffs' assertion that Ford Canada had conspired with others to continue doing what it had previously been doing unilaterally as "pure speculation." As we discuss in detail below, we disagree with this characterization of the plaintiffs' evidence.

found." (*Id.* at p. 49.) Thus, it is the existence of an agreement (or lack thereof) that is controlling. (See also *General Motors*, *supra*, 384 U.S. at p. 140 [noting that whatever General Motors might lawfully have done individually to enforce its dealer agreements "is beside the point" in the face of evidence of an unlawful combination in restraint of trade].)

Moreover, evidence of the manufacturers' prior course of conduct becomes less meaningful if a plausible argument can be made that industry conditions changed significantly at or around the time of the alleged conspiracy. Here, evidence exists from which a reasonable jury could conclude that segregating the Canadian and American automobile markets was becoming increasingly difficult by the end of the last century. Specifically, in the 1980's, Canadian vehicles differed from their U.S. counterparts with respect to physical and mechanical attributes, emission control systems, and safety parameters. For instance, in 1983, Ford Canada projected that 70 percent of its 1984 Canadian cars and light trucks would not comply with U.S. exhaust regulations and could not legally be imported or operated in the United States. GM informed its dealers in 1986 that some of its Canadian vehicles "may not meet U.S. EPA requirements." Under such circumstances, it appears that the "export problem" during this timeframe was smaller and often involved particularly desirable, or "hot" cars.

In addition, while manufacturers, including Ford Canada, employed certain export restraints to address the issue, evidence presented suggests that those controls were based, at least in part, on legitimate customer satisfaction and legal concerns that no longer existed during the alleged conspiracy period. For instance, Ford Canada opined that export sales of its 1984 vehicles would present U.S. purchasers with "insurmountable difficulties" and could result in repercussions for the dealer, Ford Canada, and Ford U.S. In 1986, GM stated that the importation of gray market vehicles made it difficult to administer safety recalls and vehicle warranties and led to "some customer dissatisfaction." In 1988, Honda noted that parts for warranty service on non-USA vehicles might not be readily available in the United States.

However, as Ford Canada itself recognized, by 1999 the gray market export of its vehicles "seemed to be spiking up fairly significantly." At the same time, the harmonization of the Canadian and U.S. markets occurred and a favorable exchange rate for arbitrage was available. As a result, for the first time, automobile manufacturers faced the possibility of large numbers of essentially fungible, yet less expensive, cars crossing the border from Canada to the United States.[19] No longer primarily an issue of customer dissatisfaction, it became more clearly a lost profits issue, especially if another manufacturer chose not to enforce export restrictions in order to reap the profits available from selling into this new discount channel of distribution.

In fact, the evidence shows that this very thing happened to Ford Canada immediately prior to the alleged conspiracy period. Specifically, Ford Canada was approached in 1999 by an alleged rental car dealer seeking to buy 1,300 automobiles. Suspicious that the company was actually buying the vehicles for export, Ford Canada declined the transaction. However—as reported to Ford U.S. by two different Ford Canada executives—GM Canada and Chrysler Canada subsequently agreed to split the sale of the 1,300 automobiles "despite the export 'compromise.' " Arguably, these statements indicating the existence of an "export compromise" could be viewed as evidence that some type of conspiracy involving exports was in existence as early as 1999.[20] At a minimum, however, the evidence of this aborted

---

[19] Unsurprisingly, this coincided with information gathering by the manufacturers with respect to the scope of the problem and possible solutions implemented by competitors. In December 1999, a Ford Canada employee reported a discussion with his "contact" at Honda Canada regarding Honda Canada's existing export restrictions, including the voiding of warranties. In June 2000, a Ford Canada employee contacted his counterpart at Chrysler Canada and learned exports were a major problem for them. In September 2000, a Ford Canada executive spoke with Toyota Canada and learned about its response to the export problem, including pricing "hot" cars the same in the United States and Canada.

[20] When deposed, both Ford Canada executives offered nonconspiratorial, though differing, explanations for their use of the term "export compromise."

rental car transaction suggests that Ford Canada's adherence to its export policies cost it millions of dollars in profits and significant market share because its vehicles were viewed as interchangeable with the vehicles of other manufacturers for gray market purposes. Indeed, Ford Canada acknowledged that it would "feel the share impact." Further, not only did Ford lose money on the initial sale of the vehicles in Canada, but the exported cars became cheaper, intra-brand competition for Ford in the United States. Construing all of this evidence in the light most favorable to the plaintiffs, a plausible inference exists that—whatever Ford Canada's previous policies or "compromises" regarding export sales—a substantial, and seemingly different, problem was emerging as early as 1999 that may have demanded a new response.

In arguing against the existence of an illegal conspiracy, Ford also continually stresses that no agreement to take joint action came out of any of the allegedly conspiratorial meetings. However, the absence of any post-agreement indication of specific joint activity among the manufacturers is not fatal to plaintiffs' conspiracy claim. Ford simply ignores the fact that the posited conspiracy was not necessarily to work together on joint initiatives, but rather, as the plaintiffs described it: "to provide assurances that each defendant would enforce anti-export policies." That is, it was an agreement that no one would break ranks and take for themselves the significant profits available in the export market, as had happened in 1999 to the financial detriment of Ford Canada. Judge Hornby concluded as much in the federal MDL action when, after detailing the many ways in which the defendants declined to take industry-wide action, he opined: "But there is nevertheless probably enough for a jury to find at least an informal agreement to restrain Canadian exports." (*In re New Motor Vehicles Canadian Export Litig.*, *supra*, 632 F.Supp.2d at p. 47 & fn. 8; see also *Monsanto, supra,* 465 U.S. 752, 764; *Jones v. City of Chicago* (7th Cir. 1988) 856 F.2d 985, 992 ["[i]t is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to

42

further them"].)  Thus, we are not persuaded that the lack of evidence of an adopted industry-wide "solution" necessarily undercuts the plaintiffs' conspiracy claims.

Finally, we agree with the trial court that evidence indicating that certain of the defendant manufacturers "stepped up" their anti-export policies after the start of the alleged conspiracy period is not necessarily evidence of an agreement to do so.  The evidence that the plaintiffs themselves present shows that manufacturers were facing an entirely new economic climate in which an unprecedented number of essentially fungible lower-priced Canadian vehicles were suddenly available for profitable export to the United States.  Under such circumstances, it seems plausible, that— even in the absence of a conspiracy—manufacturers might decide unilaterally to boost their efforts to combat this extremely costly problem.  Thus, in this case, without other evidence tending to exclude the possibility of unilateral behavior, documentation of increased action to combat exports is not particularly probative of unlawful conspiracy.

Having described the evidence and arguments we find unconvincing, we turn now to a discussion of the evidence that could be interpreted as tending to exclude unilateral action, thereby making unlawful conspiracy more likely than not.[21]

1.    *Meeting Evidence*

First, plaintiffs have produced significant evidence of telephone and in-person meetings among the manufacturers, aided by CADA, the express purpose of which

---

[21] Citing *Continental Ore*, plaintiffs argue on appeal that the trial court erred by failing to consider all of the conspiracy evidence as a whole.  Instead, they claim, the court below compartmentalized the various types of evidence and then gave the benefit of the doubt to Ford on every category.  The trial court, however, expressly addressed this very argument, stating:  "I didn't compartmentalize the evidence.  I'm aware that when you have a claimed conspiracy, the parts relate to each other."  More fundamentally, given our de novo review of the matter, the trial court's process in reaching its decision is essentially irrelevant.  We will engage in our own review of all of the evidence presented. (See *Continental Ore*, *supra*, 370 U.S. at p. 699; see also Code Civ. Proc., § 437c, subd. (c) [summary judgment appropriate only when "all the papers submitted" show no issue of material fact].)

was to come up with a joint approach to stamping out the gray market export of Canadian vehicles to the United States. As stated above, there is evidence in the record that, by 2000, the manufacturers were discussing the magnitude of the export problem among themselves. In addition, during this timeframe, individual manufacturers conferred regarding the possibility of working together to address unauthorized export sales. For instance, Toyota Canada asked a representative of Honda Canada (Miller) if he was "interested in joining with some other manufacturers to come up with a common method of resolving export sales." Miller was also contacted by Ford Canada and Chrysler Canada to the same effect. Indeed, a representative of Ford Canada called Miller in an attempt to persuade him to work together on the export issue, stating that Honda Canada "should join them. It was for the betterment of the industry" and "it would be easier if all the manufacturers were common in their approach to the dealers, as it relates to export sales."[22]

On October 25, 2000, Norm Stewart, General Counsel for Ford Canada, sent a message via facsimile to the CVMA indicating that he wanted the CVMA to "initiate a conference call" with representatives of GM Canada, Chrysler Canada, Honda Canada, and Toyota Canada "as soon as possible, to discuss a proposed meeting with CADA . . . *aimed at developing an industry-wide approach to ending unauthorized export sales*" (italics added). On October 27, 2000, Stewart participated in a conference call with representatives of other automobile manufacturers, including Chrysler Canada (Grant), GM Canada (McDonald), Honda Canada (Miller), and Toyota Canada (Millette). According to Stewart, who admitted that the call was organized at his request, the purpose of the call was to "talk about export issues." Stewart's deposition testimony further reveals that the result of the call was direction to Dave Adams at CVMA "to get back to CADA to indicate that we would be prepared to meet."

---

[22] These statements regarding the potential benefits of joint action were not admitted by the trial court for their truth.

44

Ultimately, an industry meeting was scheduled at CADA's offices on May 15, 2001, to discuss the export sales problem.  Representatives of Ford Canada (Stewart), GM Canada (Risebrough and McClean), Chrysler Canada (Rose), Toyota Canada (Millette), the CVMA (Adams), and the AIAMC (Biggs) attended a "pre-meeting" on May 15 to discuss the issues that they anticipated would be raised at this CADA-sponsored event.  These same individuals—along with additional representatives of the AIAMC (Hodges and Watkins) and Chrysler Canada (LeBlanc), representatives from CADA (Little, Gauthier, Ryan, Riccoboni, and Clark) and representatives of certain regional dealer associations—then attended the actual meeting in CADA's offices, which reportedly lasted from lunchtime until four or five o'clock.

Minutes from the meeting, the admissibility of which was determined above, indicate that the meeting's objective, as articulated by CADA, was to develop "a strategy to solve the industry problem of export sales of new automobiles to the United States," including the possibility of "one set of rules, a protocol, which could be applied across the industry."  Possible industry solutions, and the difficulties associated with them, were explored.  For instance, a representative of a regional dealer association indicated that no-export clauses in sales agreements did not appear to be an effective deterrent.  A common due diligence list was seen as problematic because it would be overly cumbersome to use with every customer; sophisticated export brokers would likely find ways to circumvent the standard process; and customers were reported to resent being questioned regarding their purchase. Development of a shared database of known exporters, possibly maintained by CADA, was criticized due to possible definitional differences among manufacturers, the need for constant updating, and Competition Act, Privacy Act, and defamation concerns.  Participants also discussed the development of a best practices list through dialogue with the dealers and lobbying the government for tax reform aimed at combating export sales.

In the end, as mentioned previously, no particular solution was adopted. Rather, a list of proposed actions was generated, including: (1)  determining the size

45

of the problem through collection of statistical data from all manufacturers; (2) developing an employee education program for the dealers on the export issue; (3) tax reform to eliminate certain rebates for gray market exports; (4) profiling the importance of the two-tiered distribution system to Canada, as equalization of pricing in Canada and the United States could lead to fewer sales in Canada, lost jobs, and older cars on the road; (5) seeking advice from outside counsel "with respect to any Competition Act implications of any industry-wide export sales initiatives"; (6) surveying dealers with respect to their best practices in the prevention of exports; (7) checking with NADA to assess the export situation from the U.S. perspective; and (8) investigating the possible future development of a shared database. As stated above, the minutes ended with the admonition: "**PLEASE KEEP THESE NOTES CONFIDENTIAL**."

Citing *Biljac* and the trade association meeting cases, Ford argues that discussing an industry problem as a group is not evidence of an illegal agreement to restrain trade and, in fact, is actually condoned by the Cartwright Act. (See *Biljac*, *supra*, 218 Cal.App.3d at p. 1430; see also *Aguilar*, *supra*, 25 Cal.4th at pp. 839–840, 862–863; *In re Citric Acid Litigation*, *supra*, 191 F.3d at pp. 1097–1099; *Alvard-Polk*, *supra*, 37 F.3d at pp. 1005–1006, 1013–1014.) We agree that, given the evidence of changed market forces during the timeframe of the alleged conspiracy— including the harmonization of safety and environmental standards, the weakening of the Canadian dollar, and the recent spike in gray market exports—the issue of export sales was a "timely and natural one[] within the industry." (*Biljac*, *supra*, 218 Cal.App.3d at p. 1430.) However, we believe the evidence in this case goes significantly beyond the benign exchange of information on a common industry problem permitted under the antitrust laws. Indeed, this is not a situation where the export issue was part of a general industry discussion covering a large number of topics. (*Biljac*, *supra*, 218 Cal.App.3d at p. 1433.) Instead, the evidence shows a series of communications and meetings the sole purpose of which was, as plaintiffs

46

put it, "to figure out an industry solution to stamp out the export problem."[23] In addition, the record is clear that the participants were aware of the legal problems inherent in concerted activity among the manufacturers. Yet they met and discussed working together on restricting exports anyway. Under these circumstances, we believe that the evidence of telephone and in-person meetings among the alleged co-conspirators proffered by the plaintiffs could be viewed as tending to exclude the possibility that the manufacturers acted independently rather than collusively with respect to exports. (See *Aguilar*, *supra*, 25 Cal.4th at p. 852.)

Moreover, our conclusion is not altered by Ford's additional claim that *agreeing to meet* with competitors to discuss the possibility of an industry-wide solution does not make it more likely than not that the individual actions subsequently taken by the manufacturers to restrict exports were the result of an illegal agreement, especially where the evidence shows that no industry-wide solution was ever implemented. As discussed above, we do not believe the fact that no common response to the export problem was ever adopted by the manufacturers precludes a finding of conspiracy. As for the argument that agreeing to meet is different than agreeing to conspire, that is, of course, true. However, agreeing to meet extensively on the sole topic of how best to restrict exports as an industry certainly raises a plausible inference that the alleged co-conspirators had all previously agreed to hold the line together on export sales, and were thus willing to

_____

[23] Indeed, this is the position that was initially articulated by the trial court, which stated during the summary judgment hearings below: "You can't satisfy your burden by showing that there was an opportunity to meet. You can't satisfy your burden to show that they simply met without regard to regarding [sic] anything. So the type of evidence you usually see that there was a convention and they all went to the convention, and they all had dinners together and the like; not enough. [¶] What you have here is a series of communications where it is clear what the topic of the communications would be, and I think there is admissible evidence as to each of the defendants here that they participated to some extent in communications with each other where the topic of the problem that they all shared was discussed. So that's different than saying, well, they had lunch at the American Bankers Association."

47

explore together in detail the most effective means of implementing that anti-competitive pact.  Thus, the meeting evidence might be sufficient, in and of itself, to defeat Ford Canada's summary judgment motion.  Ultimately, however, we need not decide whether this evidence, standing alone, is sufficient to persuade a trier of fact that unlawful conspiracy among the automobile manufacturers is "more likely" than permissible competition, because the record contains additional evidence supporting the existence on an illegal agreement to restrict Canadian exports.  (See *Aguilar*, *supra*, 25 Cal.4th at p. 852.)

2.      *Possible Direct Evidence of Agreement*

For instance, as discussed at length above, Pierre Millette's conclusion after participating in the May 15, 2001, CADA meeting—as well as a number of previous meetings and calls—was that there was "general support for the approach" of trying to keep Canadian vehicles in Canada.  Moreover, when asked if there was an agreement among the manufacturers "to work together to keep vehicles in Canada," Millette responded that it wasn't an "agreement," but was instead "simply a concept that there was some consensus on from everyone at the meeting."  We believe that this evidence—that one of the key alleged co-conspirators thought that there was a "consensus" among all of the meeting participants to work together to keep Canadian vehicles from crossing the border—could be viewed as highly probative of conspiracy.  Indeed, based on these comments, which the trial court expressly refused to consider, a reasonable juror could conclude that Ford Canada and the other alleged co-conspirators " ' "had a conscious commitment to a common scheme designed to achieve an unlawful objective" ' " (*Biljac*, *supra*, 218 Cal.App.3d at pp. 1425–1426.)  In other words, the trier of fact could find that each member of the group had committed to do its part to restrain Canadian new vehicle exports to the United States, thereby cutting off a burgeoning discount channel of distribution.  (Cf. *General Motors*, *supra*, 384 U.S. at p. 144 ["General Motors  sought to elicit from all the dealers agreements, substantially interrelated and interdependent, that none of them would do business with the discounters.  These agreements were hammered out

48

in meetings . . . and in telephone conversations . . . . It was acknowledged from the beginning that substantial unanimity would be essential if the agreements were to be forthcoming"].)

Of course, we recognize that Mr. Millette's comments are subject to interpretation and are at least potentially contrary to other of his statements contained in the record. Indeed, for its part, Ford argues that the Millette testimony is not direct evidence of conspiracy proving, at most, only that all of the manufacturers viewed Canadian exports as a problem. However, as our Supreme Court recently reiterated: " '[T]he task of disambiguating ambiguous utterances is for trial, not for summary judgment.' " (*Reid*, *supra*, 50 Cal.4th at p. 541; see also *ibid.* ["[d]etermining the weight of . . . ambiguous remarks is a role reserved for the jury"].) Put another way, in ruling on a motion for summary judgment, "the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact." (*Aguilar*, *supra*, 25 Cal.App.4th at p. 856; see also *Monsanto*, *supra*, 465 U.S. at pp. 767–768 & fn. 12 ["[t]he choice between two reasonable interpretations of the testimony was properly left for the jury"].)

For our purposes, then, it is sufficient to conclude that if presented with the Millette testimony—especially in the context of the meeting evidence discussed above—a reasonable juror could find an unlawful conspiracy to restrict Canadian exports more likely than not. (See *Aguilar*, *supra*, 25 Cal.4th at p. 852.) Further, we need not determine whether the deposition testimony is best characterized as direct or circumstantial evidence of the alleged conspiracy because we conclude that, regardless, it is evidence that tends to exclude the possibility that the alleged co-conspirators acted independently rather than collusively. (See *ibid.*) Thus, it is sufficient to support reversal of the trial court's summary judgment decision in favor of Ford Canada.[24]

---

[24] Although we do not consider it in reaching our decision, we note that there is other potential direct evidence of conspiracy in the record that the trial court excluded on hearsay grounds, a decision not challenged by plaintiffs for purposes of this summary

3. *Evidence of Actions Taken to Further Alleged Conspiracy*

In addition to the materials detailed above, several other categories of evidence presented by the plaintiffs—while perhaps not sufficient in and of themselves to send the issue of conspiracy to a jury—do tend to lend further support the plaintiff's theory of the case. For instance, the uncontested evidence shows that all of the manufacturers continued to enforce export restrictions in the wake of the May 15, 2001, CADA meeting, with many "stepping up" their export efforts. In June 2001, Ford Canada generated a list of Export Sales Policy Actions, including "[o]ngoing dialogue with industry contacts to share 'best practices.' " Thereafter, in August 2001, Ford Canada requested that its regional managers contact dealers, informing them that continued export sales would "result in restricted allocations of high demand products for Canadian Dealers and increased pressure to increase prices." Further, they were to indicate that such sales could lead to termination, chargebacks, and suspension from dealer incentive programs. Finally, the managers were instructed to assure the dealers that "[t]he company will *share best practices* volunteered by you and your fellow Dealers in preventing export sales *as well as working with CADA and other vehicle manufacturers on an industry-wide approach to deter export sales.*" (Italics added.) There is also evidence that Ford Canada actually reduced vehicle allocations, provided blacklists of known exporters to its

judgment motion. For instance, a draft letter by a senior executive at Chrysler Canada dated April 2002 to "All DaimlerChrysler Canada Retailers" states: "*We have joined forces with the other manufacturers* (with CVMA and AIAMC) and have met with CADA officials to explore *additional* deterrents to the export activity." (Italics added.) In addition, an internal email from Pierre Millette to others at Toyota Canada describes an April 2002 meeting among representatives of CADA, various manufacturers, and dealers as follows: "GM was not present but had advised they were supportive of joint action. They are involved in a lawsuit with one of the biggest exporters and one of the allegations is an industry conspiracy to stop exports which *makes their participation in the conspiracy* (all present agreed there was nothing illegal with what was being done) *to stop exports a problem.*" (Italics added.)

dealers, circulated best practices, imposed chargebacks, and initiated dealer termination proceedings during this timeframe.

Other manufacturers followed suit, each relying on the export restrictions they found most effective for their particular situation. Chrysler Canada, for instance, issued chargebacks, maintained a blacklist of known or suspected exporters, and supplied its dealers with a list of due diligence "checkpoints" to be employed to uncover exporters. It began refusing to honor warranties beginning in 2002. GM Canada issued chargebacks; enhanced its best practices list; and strengthened its Franchise Agreement to allow for penalties on, and termination of, exporting dealers. Toyota Canada had an online blacklist of suspected exporters, issued chargebacks, and monitored the availability of replacement speedometers. Honda Canada stopped honoring warranties in 1998 for gray market vehicles. During the period of the alleged conspiracy, it maintained a due diligence checklist, issued chargebacks, and reduced vehicle allocations to exporting dealers. Thus, the manufacturers consistently enforced export restraints during the timeframe of the alleged conspiracy, and there is no evidence in the record that any manufacturer broke ranks during this period and decided to collect the easy profits available to it from allowing gray market sales. Although insufficient standing on its own, such parallel conduct can be probative evidence of unlawful collusion. (*Apex Oil Co. v. DiMauro* (2d Cir. 1987) 822 F.2d 246, 253.)

An agreement among competitors, however " 'may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors.' " (*Mayor and Council of Baltimore v. Citigroup* (2d Cir. 2013) 709 F.3d 129, 136 (*Citigroup*).) These plus factors include things such as: "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." (*Ibid.*) Here, the alleged co-conspirators continued to meet and otherwise communicate regarding the export issue during the alleged conspiracy period. An additional

51

conference call on export sales was held on May 28, 2001. Representatives of Ford Canada met with CADA in February 2002 to discuss exports. Toyota Canada met with CADA in March 2002 with respect to similar concerns. Two other CADA-sponsored industry meetings on the topic of export sales were held in April and November 2002. Thus, there was a high level of interfirm communication.

In addition, the plaintiffs presented evidence that the alleged co-conspirators shared information throughout the alleged conspiracy period. For example, in March 2001, Ford Canada obtained a copy of Chrysler Canada's blacklist and added the names to Ford's blacklist. During the May 28, 2001, conference call, Norm Stewart explained Ford Canada's process for tracking exports through VIN's and suggested that the industry could undertake a similar analysis. In March 2002, GM Canada was in possession of export volume data pertaining to both Ford and Chrysler. Further, as stated above, in June 2001, Ford Canada espoused "[o]ngoing dialogue with industry contacts to share 'best practices.' " It sent a copy of its best practices to CADA in March 2002. However, Ford's own expert testified that enforcing export restraints was a difficult and expensive thing to do and that sharing know-how with a rival that would reduce its export costs or help protect its dealer network would not be in Ford's unilateral self-interest absent receipt of something in return.

In fact, such information sharing, in and of itself, was found sufficient to defeat summary judgment in *Coca-Cola*, *supra*, 2000 U.S. Dist. LEXIS 17089. In that case, the plaintiff alleged that the Coca-Cola Company and its horizontal competitors, including Pepsi Cola and Cadbury Schweppes, were engaged in a conspiracy to exchange information about exporters and drive them out of business. (*Id.* at *28.) Although there was no direct evidence of an express conspiracy to boycott exporters, there was circumstantial evidence, including: (1) documentation that Coca-Cola and Pepsi exchanged information regarding exporters; (2) a request from certain distributors that Coca-Cola handle exports for Canada Dry in the same way it handled Coca-Cola exports; (3) a memorandum indicating that Coca-Cola had provided Canada Dry with the names of three exporters; and (4) a report by Cadbury

Beverages which included information on Coca-Cola exports. (*Id.* at \*29–30.) Rejecting Coca-Cola's argument that this information sharing revealed only " 'isolated contacts' that occurred after each manufacturer independently adopted its own [anti-export] program in the pursuit of each licensors' independent economic interest," the trial court concluded that summary judgment was inappropriate because "evidence of this concerted activity is more consistent with an impermissible purpose, an agreement to jointly combat the [exporting] competitors." (*Id.* at \*31.)

In sum, given the particular circumstances of this case, the parallel conduct engaged in by the manufactures during the alleged conspiracy period provides additional support for the plaintiffs' claimed conspiracy.

4.      *Evidence of Economic Motive to Conspire*

Finally, there is motive evidence in the record, suggesting that the alleged co-conspirators had no economic incentive to maintain or increase export restraints during the timeframe of the alleged conspiracy in the absence of an illegal agreement. (See *Citigroup*, *supra*, 709 F.3d at p. 136.) Although the economic analysis is complex and vigorously disputed by Ford, plaintiffs' expert Professor Robert E. Hall, of Stanford University and the Hoover Institute, essentially maintains that—under the conditions prevailing during the class period—the unilateral imposition of export restraints by an automobile manufacturer would have been unprofitable because that manufacturer would lose the profits available to it from selling Canadian vehicles into the United States market. Although the manufacturer would profit from selling more higher-priced American vehicles in the United States, the loss in profits would be greater than any gain because "the gray-market sales for one manufacturer displace the gray-market sales of other manufacturers sufficiently to more than offset the loss of authorized sales in the U.S." Thus, in Professor Hall's

opinion, "export restraints would not have been in place or enforced during the class period under unilateral action by the manufacturers."[25]

The plaintiffs argued below that such evidence made unlawful conspiracy "more likely" than permissible competition and also showed the pretextual nature of the manufacturers' asserted justifications for their export restraints. The trial court, however, was not convinced that this evidence had any probative value. Indeed, during the hearings on the various summary judgment motions before it, the trial court at one point stated: "I am mindful that the claimed conspiracy is in the economic self-interest of each of the defendants, perhaps. That alone doesn't do anything for you. That's not evidence, that's simply a perspective. And the fact that it would be in somebody's self-interest to conspire doesn't mean that they did."

In its order granting summary judgment for Ford, the court acknowledged that the plaintiffs had presented "evidence of motive and economic interest to conspire" among the alleged co-conspirators. Citing *Aguilar*, however, the trial court concluded that "[t]his evidence alone does not satisfy plaintiffs' burden of production." (See *Aguilar*, *supra*, 25 Cal.4th at p. 864 ["We recognize that Aguilar did indeed present evidence that the petroleum companies may have possessed the motive, opportunity, and means to enter into an unlawful conspiracy. But that is all. And that is not enough. Such evidence merely allows speculation about an unlawful conspiracy. Speculation, however, is not evidence"]; see also *Serfecz v. Jewel Food Stores* (7th Cir. 1995) 67 F.3d 591, 600–601, quoted with approval in *Aguilar*, *supra*,

---

[25] As mentioned above, Ford has filed a motion to exclude the opinions and testimony of Robert Hall in the trial court, along with voluminous supporting documentation. Plaintiffs, for their part, have responded with extensive materials of their own opposing Ford's motion. The trial court, however, has yet to take any action on Ford's motion to exclude, and thus the Hall reports submitted by plaintiffs in opposition to Ford's summary judgment motion remain "evidence set forth in the papers" to which no objection has been sustained by the trial court. (Code Civ. Proc., § 437c, subd. (c).) As such, they must be considered by the trial court—and in this court's de novo review— "[i]n determining whether the papers show that there is no triable issue as to any material fact." (*Ibid.*; see also Code Civ. Proc., § 437c, subd. (b)(2).)

25 Cal.4th at p. 865, fn. 32 ["[t]he mere existence of mutual economic advantage, by itself, does not tend to exclude the possibility of independent, legitimate action and supplies no basis for inferring a conspiracy"].)  While we agree that motive evidence alone is insufficient to prove conspiracy, we believe it is nevertheless a relevant consideration.

Here, if believed (and again we acknowledge that its validity is the subject of intense debate), Hall's economic analysis posits that the auto manufacturers would not have continued to restrict exports during the alleged conspiracy period in the absence of an agreement that none of them would break ranks and reap the profits available in the export market.  If true, this "tends to exclude" the possibility that the alleged conspirators acted independently rather than collusively.  (See *Aguilar*, *supra*, 25 Cal.4th at p. 852.)  Moreover, this evidence of potential economic motive to conspire does not exist in a vacuum.  Rather, it merely further supports the meeting evidence discussed above, Millette's statements regarding the existence of a "consensus" to keep Canadian cars in Canada, and the manufacturers' parallel conduct in restricting exports.

In the end, this is, perhaps, as the trial court acknowledged, "not an easy case." Nevertheless, we are mindful of Justice Mosk's admonition in *Aguilar* with respect to summary judgment motions in antitrust proceedings that "although such motions should be denied when they should, they must be granted when they must." (*Aguilar, supra*, 25 Cal.4th at pp. 847, 852.)  Viewing all of the evidence as a whole and in the light most favorable to the plaintiffs, we conclude that summary judgment must be denied in this case because it should.  Plaintiffs have produced sufficient evidence to create a genuine issue of material fact as to whether Ford Canada and its competitors entered into an illegal conspiracy to restrict the export of lower-priced Canadian vehicles to the United States.

## IV.  DISPOSITION

The judgment of the trial court with respect to Ford U.S. is affirmed.  The trial court's summary judgment in favor of Ford Canada, however, is reversed and the matter remanded for further proceedings consistent with this opinion.  The plaintiffs are entitled to their costs on appeal.

 

                          _____

                          REARDON, J.

We concur:

_____

RUVOLO, P. J.

_____

RIVERA, J.

| | |
|---|---|
| Trial Court: | San Francisco Superior Court |
| Trial Judge: | Hon. Richard A. Kramer |
| Counsel for Appellant: | Zelle |
| | Craig Carter Corbitt |
| | Jiangxiao Athena Hou |
| | Michael S. Christian |
| | |
| | Saveri & Saveri |
| | Guido Saveri |
| | R. Alexander Saveri |
| | |
| | Berman DeValerio |
| | Joseph John Tabacco Jr. |
| | Todd A. Seaver |
| | Matthew D. Pearson |
| | |
| | Hausfeld |
| | Michael Paul Lehmann |
| | Michael D. Hausfeld |
| | Christopher L. Lebsock |
| | |
| | Cooper & Kirkham |
| | Josef Deen Cooper |
| | Tracy R. Kirkham |
| | John D. Bogdanov |
| | |
| | Berger & Montague |
| | H. Laddie Montague, Jr. |
| | |
| | Lieff Cabraser Heimann & Bernstein |
| | Michele Chickerell Jackson |
| | Eric B. Fastiff |
| | |
| | Cohen Milstein Sellers & Toll |
| | Daniel A. Small |
| | J. Douglas Richards |
| | Kathleen M. Konopka |
| | Emmy Levens |

59

Alioto Law Firm
Theresa Driscoll Moore

Duane Morris
Paul S. Rosenlund

Blecher & Collins
Maxwell M. Bleecher
Harold Runkle Collins Jr.

Zwerling, Schachter & Zwerling
Robert S. Schachter
Dan Drachler
Joseph S. Tusa

Amamgbo & Associates
Donald Chidi Amamgbo

The Terrell Law Group
Reginald Von Terrell

Blumenthal & Nordrehaug
Norman B. Blumenthal

Morris & Associates
Stephen Bryan Morris

John Haslet Boone

Chimicles & Tikellis
Steven A. Schwartz

Glancy, Binkow & Goldberg
Susan Gilah Kupfer
Lionel Zevi Glancy

John F. Innelli

Schubert Jonckheer & Kolbe
Robert C. Schubert
Willem F. Jonckheer
Miranda Kolbe

Bramson, Plutzik, Mahler & Birkhaeuser
Alan Roth Plutzik

Kyle Loyd Crenshaw

Davis, Cowell & Bowe
Elizabeth Ann Lawrence
Philip F. Bowe

Finkelstein Thompson
Richard M. Volin
Rosemary Medellin Rivas

Green & Noblin
Robert Stanley Green

Gordon-Creed Kelley Holl & Sugerman
Kevin John Holl

James Dombroski

The Ekenna Law Firm
Chief Nnamdi Ekenna

Hagens, Berman, Sobol & Shapiro
Steve W. Berman
Anthony D. Shapiro
Elaine Teresa Byszewski

Hallisey & Johnson
Jeremiah F. Hallisey

Gross Belsky Alonso
Terry Gross

The Mogin Law Firm
Daniel Jay Mogin
Lisa J. Frisella
Chad McManamy

Alexander Michael Schack

Lawrence Genaro Papale

61

Joseph M. Patane

Jeffrey Kenneth Perkins

Trump, Alioto, Trump & Prescott
Mario Nunzio Alioto

Reich Radcliffe
Marc Gene Reich

Counsel for Respondents:    Latham & Watkins
Margaret M. Zwisler
Gregory G. Garre
Jason L Daniels
Michael E. Bern
Katherine I Twomey
Adam R. Thomas

*Automobile Antitrust Case* A134913