Filed 6/12/26  Dutton v. Anderson Zeigler, P.C. CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| STEVEN S. DUTTON,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>ANDERSON ZEIGLER, P.C., et al.,<br><br>    Defendants and Respondents. | A172146<br><br><br>(Sonoma County<br>Super. Ct. No. SCV267765) |

This case arises from an action brought by Plaintiff Steven Dutton against the estate of his former attorney, Kirt Zeigler, and Zeigler's former law firm and employer, Anderson Zeigler, P.C.[1]  Zeigler was a trusts and estates attorney who created a corporation and option agreement to enable Gail Dutton to transfer family assets to her son, Steven, and his brother, Joseph (who are also referred to as Steve and Joe, respectively).[2]  A couple years later, Zeigler prepared a stock purchase agreement whereby the brothers exercised their option to acquire the family corporation's stock.  During the same period, Steven engaged Zeigler to prepare estate plans for

---

[1] For simplicity, we refer to the defendants and Kirt Zeigler, collectively and individually, as Zeigler because Kirt Zeigler's conduct is at issue in the underlying dispute.

[2] Because the Dutton family members share a common last name, we will refer to them by their first names.  We intend no disrespect.

him and his wife, Theresa, and Steven specified that he wanted his kids to inherit the family corporation stock in the event of his death. Zeigler created two trusts, which Zeigler referred to as Steven's separate property trust and the couple's community property trust. Steven transferred his stock in the family corporation to the so-called separate property trust.

Years later, Steven filed for divorce against Theresa. He then discovered that the family corporation stock was community property notwithstanding that the stock was in his so-called separate property trust. Steven then paid Theresa for her community property interest in the stock.

Steven sued Zeigler, alleging causes of action for professional negligence and breach of fiduciary duty. In amended pleadings, Steven further alleged constructive fraud and actual fraud causes of action. The trial court sustained Zeigler's demurrer without leave to amend as to the fraud claims in the operative pleading. Subsequently, the court granted Zeigler's motion for summary judgment on the negligence and breach of fiduciary duty causes of action.

We affirm the trial court's order sustaining Zeigler's demurrer to Steven's fraud causes of action. We reverse the court's order granting Zeigler's summary judgment and remand for further proceedings.

## I. BACKGROUND

### A. The Family Business and The Option Agreement

In 1963, Warren and Gail married and formed a family farming business, Dutton Ranch. They had two sons, Steven and Joseph, both of whom worked for the family business. In 1993, Steven married Theresa. The couple had no premarital agreement, and Steven continued working for the family business throughout their marriage. They had two children.

Warren and Gail used Zeigler as their attorney for business and estate planning needs. And in 1995, Zeigler prepared a trust for the couple into

2

which they transferred Dutton Ranch. Warren passed away in 2001 and ownership of Dutton Ranch passed to Gail.

Zeigler administered Warren's estate, including Warren and Gail's trust. Zeigler also restructured Dutton Ranch into separate legal entities, including Dutton Ranch Corporation (DRC) to hold business assets. At its formation, DRC was solely owned by Gail.

After forming DRC, Gail explored how to sell the business to her sons. Gail wanted to keep the business in the family, and she expected both her sons to continue working for the business. But it was also important to Gail that her sons purchase the business to provide her financial security. Gail was advised—by Zeigler as well as her accountant—to grant Steven and Joseph an option to purchase her DRC stock.

Zeigler prepared an option agreement, which granted Steven and Joseph an exclusive option to buy all the DRC stock for $2,000,000 so long as the brothers jointly exercise the option and each purchase one-half of the shares. The agreement stated that the "option [was] granted in consideration of Steve's and Joe's employment by Dutton Ranch Corp." The agreement further provided that, upon exercising the option, the brothers would pay Gail in monthly installments over 10 years, DRC's debts to Gail would be paid in full, and Gail would be removed as DRC's guarantor. The agreement was executed in 2004, commencing a four-year window for Steven and Joseph to exercise the option.

## B. Steven's Estate Planning

In late 2006, Steven engaged Zeigler to prepare an estate plan for him and Theresa. Steven informed Zeigler that his goal was for "what [Steve] called the 'inherited assets' to end up with his children and not a new husband" if he predeceased Theresa. "In terms of characterizing their

3

property, [Steven] told [Zeigler] that Theresa inherited about $70,000 after they were married and that everything else has come from Steve's family or from their work."

In an undated internal note, Zeigler wrote that "[he] told Steve there [were] a number of extremely complicated problems" due to the lack of prenuptial agreement. The note (including handwritten annotations) continued: "The whole question of community property and separate property is another swamp for [Steven and Theresa]. A major reason for that is that a lot of assets that are received by Steve through family transfers, including all of the farming operation, the real estate, the vineyard leases and the equipment and so on could be characterized as Steve's separate property, except that he spends full time and more working to make that whole situation work and to maximize the values of those assets. [Zeigler] explained very briefly [to Steven] what that does to the character of those assets." After chronicling the assets that Steven was willing to let Theresa control, Zeigler wrote: "[W]e need to try to find a way to allocate all of his interest in those assets to her in exchange for having her interest in the Dutton family assets be allocated to Steve, at least at the time of death."

In February 2007, Zeigler circulated drafts for the "Steven G. Dutton and Theresa A. Dutton Community Property Trust Agreement" and the "Steven G. Dutton Separate Property Trust Agreement." Zeigler told the couple that "it turns out to be much simpler to do two trusts than a single trust. One trust will contain all of your community assets and the other will contain Steve's separate property (the Dutton family assets)."

## C. The Stock Purchase Agreement

Also in 2007, Zeigler prepared a stock purchase agreement (SPA) for Steven and Joseph to exercise their option to buy the DRC stock. According

4

to Steven, Zeigler "represented all parties to the [SPA] during the negotiation and drafting of the [SPA]." Gail, Steven, and Joseph each executed the SPA between December 2007 and January 2008. Pursuant to the SPA, the brothers would pay Gail in monthly installments for the next decade. Thus, Steven—while still married to Theresa—began acquiring the DRC stock, funding the purchases from his "monthly distributions as [an] owner[] of DRC."

### D.      Steven and Theresa's Trust Agreements

Steven and Therea's estate planning fell by the wayside until late 2008 when Zeigler reengaged Steven on the subject. Joseph and Gail were involved in the discussions too.

Zeigler knew that "Steve want[ed] all of the Dutton Ranch and Dutton Farming business to pass to his descendants. He [did] want to provide for his wife, Theresa, but at the end of the day he [did] not want those properties to go to anyone but his children and grandchildren." Zeigler also knew that both brothers wanted to ensure that whomever outlived the other would "be able to run the farming business without the interference from the widow of the decedent, any spouse of the widow of the decedent, or children who are not old enough to understand it." However, Zeigler observed in a memorandum that "[the] two goals fly in the face of one another."

In the same memorandum, Zeigler noted that there was consensus that "the assets that are owned by [the brothers] and their spouses will be put in the community property trust, and the ranch and real estate entities will be put in their separate property trust." But Zeigler further wrote that the memorandum was not exhaustive on the subject.

In January 2009, Zeigler sent Steven revised drafts of the trusts. Zeigler advised that Theresa would be the beneficiary of "the great bulk of

[Steven's] separate property assets (perhaps all of them) . . . in the event of [Steven's] death."

Throughout the next year, Zeigler asked Steven to review and confirm which assets should be held in Steven's "Separate Property Trust" and which assets should be held in Steven and Theresa's "Community Property Trust." During the drafting, DRC shares were included in the exhibit attached to Steven's separate property trust. Steven and Zeigler never discussed what would happen to the assets if Steven divorced Theresa.

The two trusts were executed on March 30, 2010. The same day, the couple assigned to Steven, as trustee of the separate property trust, "all of their right, title, and interest in" another asset listed in the exhibit to Steven's separate property trust, the Dutton Brothers Partnership. There was no similar assignment or transmutation agreement for the DRC stock.

## E. Steven's Suit Against Zeigler

In April 2017, Steven filed for dissolution of his marriage to Theresa. During the dissolution proceedings, Steven was informed by his counsel that the DRC stock was community property. In May 2018, Zeigler confirmed that there was no transmutation agreement securing Steven's separate property ownership interest in the DRC stock.[3] In 2020, Steven and Theresa reached an agreement on the value of the DRC stock, and eventually Steven paid Theresa $3,420,496 for her community property interest in it. Zeigler passed away that same year.

In 2021, Steven filed a complaint against Zeigler, alleging causes of action for negligence and breach of fiduciary duty. In 2022, Steven filed a first amended complaint, adding causes of action for constructive fraud and

---

[3] Less than a year later, Steven and Zeigler entered into a series of tolling agreements to preserve Steven's claims.

6

actual fraud based on concealment, along with punitive damages allegations. Zeigler demurred to the fraud causes of action, which the trial court sustained with leave to amend. In 2023, Steven filed a second amended complaint, and later that year, pursuant to a stipulation, the court granted Steven leave to file the third amended complaint (TAC).

The operative TAC alleged that Zeigler failed to advise Steven of any actual or potential conflict of interest between him and Theresa, "jeopardize[ing] [Steven's] efforts to have the DRC stock be his separate property, in his Separate Property Trust." And it alleged that "[Zeigler] led [Steven] to believe that the property in his Separate Property Trust was indeed his separate property, as he had instructed [Zeigler] was his desire." Moreover, the TAC claimed that "[Theresa] would have signed a Transmutation Agreement on March 30, 2010 relating the transfer of the DRC stock to Plaintiff's Separate Property Trust" "[b]ased on her [prior] conduct," or alternatively "[Steven] could have had the ownership and/or stock interest transfer of the DRC stock structured in a different manner to ensure that it was his separate property."

Steven's negligence and breach of fiduciary duty causes of action were premised on Zeigler's failure to provide Steven and Theresa conflict waivers, failure to advise the couple of the need for separate counsel, and failure "to obtain [Theresa's] signature on valid and enforceable transmutation agreement." The constructive and actual fraud causes of action were premised on Zeigler's alleged concealment of his conduct and omissions during his representation of Steven. Steven sought punitive damages for the fraud claims.

## F.    The Sustained Demurrer and Motion for Summary Judgment

Zeigler demurred to the fraud causes of action in the TAC and moved to strike certain allegations and Steven's request for punitive damages. The

7

trial court sustained the demurrer without leave to amend and granted, in relevant part, the motion to strike the request for punitive damages. The court incorporated by reference sections of its prior ruling on the first demurrer and concluded that Steven "still [had] not sufficiently alleged causation and reliance." Noting it was Steven's third attempt to plead viable fraud claims, the court found he failed to meet his burden of showing how he could cure the defects.

After answering the remaining allegations in the TAC, Zeigler subsequently filed a motion for summary judgment, which asserted a lack of causation as to both the negligence and breach of fiduciary duty causes of action. Steven opposed the motion.

The trial court granted Zeigler's summary judgment motion. The court found that "[t]he central problem with [Steven's] position is that it rests on the premise that Theresa actually *would* have signed a transmutation agreement if some combination of [Steven] and [Zeigler] had asked her to." The court excluded Steven's evidence of past deed transfer and assignment agreements that Theresa signed. In view of the remaining evidence, the court found Steven failed to raise a triable issue of fact that Theresa would have signed a transmutation agreement. The court also rejected Steven's argument that there were "other actions [Ziegler] could have taken to transmute the DRC stock to [Steven's] separate property" as "equally speculative."

Judgment was entered in Zeigler's favor and Steven appealed.

## II.    DISCUSSION

### A.    Demurrer

Steven contends the trial court erred in sustaining Zeigler's demurrer against his fraud causes of action. We disagree.

8

"When reviewing a ruling on a demurrer, we examine de novo whether the complaint alleges facts sufficient to state a cause of action." (*Liapes v. Facebook, Inc.* (2023) 95 Cal.App.5th 910, 919.) In doing so, we assume the truth of properly pled factual allegations, "[b]ut we do not assume the truth of 'contentions, deductions, or conclusions of law.' " (*Ibid.*) Reversal is only warranted if the plaintiff shows the complaint alleges facts sufficient to establish every element of each cause of action. (*Ibid.*) "We will affirm the ruling if there is any ground on which the demurrer could have been properly sustained." (*Intengan v. BAC Home Loans Servicing LP* (2013) 214 Cal.App.4th 1047, 1052.)

"In California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] 'Thus " 'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect.' " ' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.) Every element of actual fraud and constructive fraud must be pled specifically. (*Tindell v. Murphy* (2018) 22 Cal.App.5th 1239, 1249–1250; *Moncada v. West Coast Quartz Corp.* (2013) 221 Cal.App.4th 768, 776.)

" '[T]he elements of a cause of action for fraud based on concealment are: " '(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.' " ' " (*Jones v. ConocoPhillips Co.* (2011) 198 Cal.App.4th 1187, 1198.) The

9

elements of constructive fraud are: "(1) a fiduciary relationship, (2) nondisclosure, (3) intent to deceive, and (4) reliance and resulting injury." (*Tindell v. Murphy*, *supra*, 22 Cal.App.5th at pp. 1249–1250.)

With respect to both fraud causes of action, the TAC does not allege causation with sufficient specificity. Steven's causation allegations for each fraud claim are nearly identical,[4] stating: "If [Steven] had been informed by [Zeigler] of [his] failures . . . [Steven] would have behaved differently, including avoiding and/or mitigating the damages suffered by [Steven] as alleged herein. If [Steven] had been informed of the true facts . . . [Steven] would have reasonably acted differently such as he would have obtained independent counsel to properly advise him and prepare legally sufficient documents that the DRC stock was his separate property and/or he would have had the ownership and/or stock interest transfer of the DRC stock structured in a different manner to ensure that it was his separate property."

Steven's allegation that "he would have obtained independent counsel to properly advise him and prepare legally sufficient documents that the DRC stock was his separate property and/or he would have had the ownership and/or stock interest transfer of the DRC stock structured in a different manner to ensure that it was his separate property" is conclusory. He does not state what particular actions would have mitigated his damages.

Steven argues the particularity requirement "surely does not require a plaintiff to allege the precise manner of how the transaction could alternatively be structured." In these circumstances, we disagree. Because

---

[4] We have reproduced the allegations in support of the constructive fraud cause of action. With respect to his actual fraud claim, the allegations replace the text "to properly advise him" with "as could his wife." And the actual fraud allegations also do not contain the language "and prepare legally sufficient documents that the DRC stock was his separate property."

10

Steven began purchasing the DRC stock in 2008 under the SPA but Zeigler's alleged nondisclosures occurred on March 30, 2010 (and continued while Zeigler possessed Steven's client files), Steven must allege facts as to how he could have avoided paying Theresa her community interest in the DRC stock by taking actions *after* he had already begun buying the DRC stock with community property funds. In other words, he must specifically allege the "legally sufficient documents" or alternative "stock interest transfer" available to him in March 2010 and beyond.

Because the trial court sustained the demurrer to the fraud claims without leave to amend, "we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment." (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) However, "[t]he plaintiff has the burden of proving that an amendment would cure the defect." (*Ibid.*)

Steven does not attempt to show that an amendment could cure the defects. Indeed, Steven's reply brief does not dispute Zeigler's contention that "[Steven] did not assert any abuse of discretion regarding the denial of leave to amend." Therefore it matters not that "[s]ome of [the] details [regarding what acts could have mitigated Steven's damages] were fleshed out in the summary judgment process," as Zeigler concedes. Having failed to address how he could amend his complaint to assert valid causes of action, Steven forfeited any argument that the trial court abused its discretion in sustaining the demurrer to his fraud claims without leave to amend. (*Brown v. Deutsche Bank National Trust Co.* (2016) 247 Cal.App.4th 275, 282.) Accordingly, we need not resolve whether Steven could cure the defect by amending the allegations to include the same facts that create a triable issue

11

of material fact on causation with respect to Steven's professional negligence and breach of fiduciary duty causes of action, as discussed *post*.[5]

**B.    Summary Judgment**

Steven contends the trial court erred in granting Zeigler's motion for summary judgment on the grounds that there was no triable issue of fact concerning causation.  We agree and reverse.

*1.    Analytical Framework and Standard of Review*

"[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850; Code Civ. Proc., § 437c, subd. (p)(2).)  In moving for summary judgment, "[a]ll that the defendant need do is to . . . show that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff cannot prove element X." (*Aguilar*, at p. 853.)  For example, "[t]he defendant may . . . present evidence that the plaintiff does not possess, and cannot reasonably obtain, needed evidence . . . ." (*Id.* at p. 855.)

We review an order granting summary judgment de novo applying the same three-step process required of the trial court.  (*Johnson v. ArvinMeritor, Inc.* (2017) 9 Cal.App.5th 234, 239–240.)  " ' " 'First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no

---

[5] Whether Steven sufficiently pled his professional negligence and breach of fiduciary duty causes of action is not an issue before us.  Although we observe that—unlike with both species of fraud at issue here—such causes of action need not be specifically pled.

factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [Citations.] [¶] Secondly, we determine whether the moving party's showing has established facts which . . . justify a judgment in movant's favor. [Citations.] . . . [¶] . . . [T]he third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue.' " ' " (*Id.* at p. 240.)

In our independent assessment, we must consider all the parties' evidence (except for evidence to which a sound objection was made in the trial court) and the uncontradicted inferences the evidence reasonably supports. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476; § 437c, subds. (b)(5), (c), (d).) "[A]s an overarching principle, we view the evidence in the light most favorable to the losing party—here [Steven]—liberally construing [Steven's] evidentiary submissions and strictly scrutinizing the defendants' evidence in order to resolve any evidentiary doubts or ambiguities in [Steven's] favor." (*In re Automobile Antitrust Cases I & II* (2016) 1 Cal.App.5th 127, 151.)

### 2. Scope of the Issues

We first identify the issues as framed by the pleadings because " 'the burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint*.' " (*Alameda Health System v. Alameda County Employees' Retirement Assn.* (2024) 100 Cal.App.5th 1159, 1174.)

As to the first cause of action for negligence, the TAC alleged that Zeigler failed to exercise reasonable care in performing legal services based on five acts and omissions. The TAC repeated the same five acts and omissions as the grounds for the breach of fiduciary duty cause of action. To wit, Steven alleged: "[(1)] [Zeigler] failed to recognize that an actual conflict of interest existed between [Steven] and his then-wife in their estate

13

planning matters; [¶] [(2)] [Zeigler] failed to advise [Steven], either verbally or in writing, that he and his then-wife had an actual conflict of interest as regards whether [Steven's] ownership interest in DRC and DRC-related assets should be held as Plaintiff's separate property; [¶] [(3)] [Zeigler] failed to obtain a written conflict of interest waiver from [Steven] and his then-wife; [¶] [(4)] [Zeigler] failed to advise [Steven], either verbally or in writing, that his then-wife needed to retain and be advised by separate counsel in order to have a valid Transmutation of Property Agreement executed by her in [Steven's] favor; and, [¶] [(5)] [Zeigler] failed to obtain [Steven's] then-wife's signature on a valid and enforceable Transmutation of Property Agreement pursuant to Family Code Section 852 to ensure that [Steven's] ownership interest in DRC and DRC-related assets remained his separate property." Steven alleged that those five negligent acts and omissions were the legal and proximate cause of his damages—i.e., "the value of his lost separate property that was deemed to be community property in the dissolution proceedings" as well as associated assessment and litigation costs.

The general allegations clarified that "[Steven] worked with ZEIGLER on his and [Theresa's] estate plan" "[f]rom late 2006 through March 2010" and that "[i]n December 2006, ZEIGLER recorded that 'basically [Steven] wants what he called the 'inherited assets' to end up with his children.'" The general allegations further state that Zeigler negligently failed to advise the couple of their conflict of interest in the period "*[u]p to* and including [the date when the couple signed their trust documents]." (Italics added.)

The gravamen of Steven's complaint is that Zeigler provided incompetent advice dating back to 2006 when Steven engaged him for the purpose of assuring that his family's business would go to his children. A fair reading of the allegations is that if Zeigler had advised Steven about *why* this

14

goal created a conflict of interest with Theresa and a need to transmute the character of the property, then Steven would have mitigated his damages. (§ 452 [allegations in pleadings "must be liberally construed"].) Accordingly, Zeigler could reasonably anticipate Steven's theory of liability encompassed Zeigler's failure to advise Steven on how to accomplish his goal of keeping the family assets in his lineal family, and Zeigler's ineffectual advice to merely place the DRC stock in a trust after Steven purchased it via the SPA.

Zeigler argues that Steven pursues an unpled theory of liability that "[Zeigler] should have counseled some combination of [Steven], [Gail], and possibly others on ways they could have 'structured' [Steven's] acquisition of the DRC interest differently so as to avoid its characterization as community property." To a certain extent we agree.

At the summary judgment hearing, Steven argued the causal link as follows: "What Mr. Zeigler did was to create a mechanism which meant that the stock was not his separate property, but community property. And because of the way that Mr. Zeigler constructed, A, the transfer of the stock, and B, the estate planning for Mr. Dutton, it required that initially Mr. Dutton's then wife, Theresa, execute a transmutation agreement." The "A" part of that argumentation suggests Zeigler's negligence extends to his work in setting up the option and SPA, which was not pled. None of the specific allegations in support of Steven's negligence and breach of fiduciary duty causes of action concern the drafting, negotiating, or structuring of the option agreement or the SPA. (See *Agustin v. Golden Empire Transit Dist.* (2025) 116 Cal.App.5th 426, 440 [" '[W]hile negligence may be pleaded in general terms, the plaintiff must indicate the acts or omissions which are said to have been negligently performed' "].) Nor does Steven allege Zeigler took those actions as part of Zeigler's estate planning services to Steven. Steven cannot

15

overcome his pleading failure by directing us to evidence that allegedly corroborates his argument because evidence offered on an unpled theory of liability is irrelevant. (*Id.* at p. 444.)

But we do not read the complaint as narrowly as Zeigler invites us to. Steven's claim is not limited to the theory that Zeigler's negligence prevented Steven from obtaining Theresa's signature on a valid transmutation agreement. Liberally construed, the scope of the pleadings embraces a theory that Zeigler was negligent *in the estate planning engagement* by failing to advise Steven that how he acquired his family's business assets, such as via the SPA, would affect its character and that Steven should therefore pursue alternate methods of receiving the DRC stock and passing it to his descendants than merely assigning the purchased stock to a trust.

### 3. Steven Demonstrated The Existence Of A Triable, Material Factual Issue On Causation

Professional negligence and breach of fiduciary duty are subject to the same requirements regarding causation,[6] at least in situations that do not involve independent or concurrent causes in fact. To prove causation on a claim for professional negligence, "the plaintiff must establish that *but for* the alleged negligence of the defendant attorney, the plaintiff would have obtained a more favorable judgment or settlement in the action in which the

---

[6] "To state a cause of action for legal malpractice, a plaintiff must plead '(1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence.' " (*Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 179.) "The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1086 (*Stanley*).)

malpractice allegedly occurred. The purpose of this requirement, which has been in use for more than [140] years, is to safeguard against speculative and conjectural claims. [Citation.] It serves the essential purpose of ensuring that damages awarded for the attorney's malpractice actually have been caused by the malpractice." (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241 (*Viner*).) To establish the causation element of a cause of action for breach of fiduciary duty, the plaintiff must "establish ' "a reasonable basis for the conclusion that it was more likely than not that the conduct of the defendant was a substantial factor in the result." ' " (*Stanley*, *supra*, 35 Cal.App.4th at p. 1095.) As our Supreme Court explained, the "substantial factor standard . . . subsumes the 'but for' test" and, absent circumstances not present here, "produces the same results." (*Rutherford v. Owens–Illinois, Inc.* (1997) 16 Cal.4th 953, 969; *Viner*, at pp. 1239–1240.)

As causation is a question of fact, it ordinarily cannot be resolved on summary judgment. (*Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 864.) In the context of a professional negligence claim, the absence of causation may be decided on summary judgment "only if, under undisputed facts, there is no room for a reasonable difference of opinion" as to the legal effect of the evidence presented. (*Ibid.*) Where, as here, a transactional representation is at issue, "[a]n express concession by the other parties to the negotiation that they would have accepted other or additional terms is not necessary. And the plaintiff need not prove causation with absolute certainty. Rather, the plaintiff need only ' "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." ' " (*Viner*, *supra*, 30 Cal.4th at pp. 1242–1243.)

Courts must bear in mind that "[d]etermining causation always requires evaluation of hypothetical situations concerning what might have happened, but did not. . . . [T]he crucial causation inquiry is *what would have happened* if the defendant attorney had not been negligent. This is so because the very idea of causation necessarily involves comparing historical events to a hypothetical alternative." (*Viner*, *supra*, 30 Cal.4th at p. 1242.) This factual inquiry can only be taken from a jury if the defendant attorney's account is undisputed and unequivocal in its import regarding causation. (*Namikas v. Miller* (2014) 225 Cal.App.4th 1574, 1583.) That is not the case here.

As we discussed above, the scope of the TAC's allegations encompasses Steven's theory that Zeigler caused his damages by failing to advise him that his estate planning goals created a conflict of interest with Theresa and certain actions would need to be taken to ensure the family assets remained in the family. The evidence shows that Steven engaged Zeigler for estate planning in December 2006 and that Zeigler informed Steven that the assets he received "through family transfers . . . could be characterized as Steve's separate property" and further "explained very briefly" that the character of those assets could change. When the engagement began, Steven told Zeigler about his desire for his family transfers to be separate property that his children would inherit. And Zeigler recognized the "need to try to find a way to allocate all of [Steven's] interest in [certain] assets to [Theresa] in exchange for having her interest in the Dutton family assets be allocated to Steve, at least at the time of death."

Steven also submitted a declaration by Gail in which she stated: "If Mr. Zeigler had informed me that the sale of the stock under the Option Agreement would make the stock community property rather than the

18

separate property of my sons, Steven and Joseph, and that he recommended that the stock in DRC either be transferred to my sons as a gift, or by means of a trust, whether directly for their benefit or of their children, or any other means counsel recommended to ensure it was not community property, I would have agreed to it, as long as I received income roughly equivalent to what was agreed as the sale price of the stock under the Option Agreement of $2 million over ten years." Thus, notwithstanding her deposition testimony, there is evidence that Gail would have considered transferring the DRC stock through means other than a sale but for Zeigler's failure to properly advise Steven.

Viewing these pieces of evidence together and in the light most favorable to Steven and resolving any evidentiary doubts in his favor, reasonable minds could differ in deciding what would have happened had Zeigler acted differently during Steven's estate planning. Put differently, Steven introduced evidence that affords a reasonable basis to conclude it is more likely than not that Steven would have obtained a more favorable result had Zeigler advised him of his conflict of interest with Theresa concerning the DRC stock given Steven's estate planning goals. Thus, whether Steven would have obtained a more favorable result but for Zeigler's alleged negligence is a triable issue of fact.

Our conclusion is bolstered by considering the declaration of Steven's expert on Trusts and Estates law, John Hartog, which we conclude was erroneously excluded by the trial court even under an abuse of discretion standard. It is unsettled whether a reviewing court should examine evidentiary rulings in the summary judgment context for abuse of discretion or de novo. (*640 Octavia, LLC v. Pieper* (2023) 93 Cal.App.5th 1181, 1189.) "[T]he great weight of authority" supports application of the abuse of

19

discretion standard, "except for evidentiary rulings that turn on questions of law, which are reviewed de novo." (*McGovern v. BHC Fremont Hospital, Inc.* (2022) 87 Cal.App.5th 181, 191; see also *Travelers Indemnity Co. of Connecticut v. Navigators Specialty Ins. Co.* (2021) 70 Cal.App.5th 341, 353 [stating the standard of review for a denial of a request for judicial notice is abuse of discretion].) We need not resolve the issue because we conclude the trial court abused its discretion and we therefore reverse under either standard.

The trial court excluded Hartog's "entire declaration on the grounds that it is irrelevant to any issue raised by the instant motion." Hartog's declaration generally concerned the standard of care for trust and estate attorneys. But Hartog further opined that Zeigler "could have recommended" alternate methods to transfer the DRC stock including "by gift . . . or transferred to a trust with the grandchildren as remainder beneficiaries and [Steven] and his brother as income beneficiaries." Hartog's entire opinion "would assist the trier of fact" because it is "[r]elated to a subject that is sufficiently beyond common experience." (Evid. Code, § 801, subd. (a).) And his opinion regarding the viability of alternative methods of transferring stock as separate property is relevant to determining the likelihood of whether Steven would have obtained a more favorable result but for Zeigler's alleged negligence during the estate planning. (See Evid. Code, § 805 ["Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact"].)[7]

---

[7] There are limits to expert testimony on causation in a legal malpractice case and the expert may not invade the province of the jury. (See *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 972–973 [holding court abused its discretion by allowing expert to testify that plaintiff " 'would very

Zeigler's other arguments are unavailing. Zeigler argues that Steven cannot establish causation because "by 2010, DRC was already being transferred to [Steven] as community property." But as discussed above, Steven's theory of liability is not limited to Zeigler's deficient advice concerning transmutation agreements and therefore Steven's theory of causation does not turn on whether he could have obtained a valid transmutation agreement.[8] For the same reason, we need not resolve whether Zeigler made a prima facie showing that Steven does not possess, and cannot reasonably obtain, needed evidence showing that Theresa would have signed a transmutation agreement. Nor do we need to address the trial court's exclusion of Steven's documentary evidence which he proffered to prove Theresa would have signed a transmutation agreement for the DRC stock in March 2010.

Relatedly, Steven's allegation that Theresa would have signed a transmutation agreement in March 2010 does not cabin Steven's theory that Zeigler's representation "[u]p to and including March 30, 2010" and as far back as "December 2006" was negligent. And even if it did, to survive a causation inquiry at summary judgment, Steven need only show it is more likely than not that he could obtain *a more favorable* result, not an award for all his claimed damages. (*Viner*, *supra*, 30 Cal.4th at p. 1244.) Thus, he need only show a reasonable basis for concluding that it is more likely than not

likely have prevailed' " but for his attorney's legal malpractice case].) But Hartog's declaration does not cross the line.

[8] This also dooms Zeigler's other arguments that it is "speculative" whether an interspousal transaction could have overcome the presumption of undue influence, and if so whether Steven had enough separate property assets as consideration for Theresa to transmute her interest in DRC stock.

that Gail would have transferred Steven or his children some DRC stock as separate property.[9]

In sum, there is a triable issue of fact whether Steven would have successfully arranged with Gail to transfer some or all of the DRC stock in a manner that preserved its separate property character had Zeigler properly advised Steven when rendering their estate planning services. Consequently, we reverse the order granting summary judgment.

## III.  DISPOSITION

The trial court's order sustaining Zeigler's demurrer to Steven's third and fourth causes of action as alleged in the TAC is affirmed. The court's order granting summary judgment is reversed. We reverse the judgment and remand the matter to the trial court for further proceedings. Each side shall bear its own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

---

[9] We recognize the tension between affirming the trial court's demurrer ruling and reversing its summary judgment ruling. On the one hand, we resolve that Steven failed to specifically plead causation as to his fraud claims and affirm the trial court's ruling that Steven was unable to cure that defect. On the other hand, we conclude that Steven submitted evidence establishing a triable issue of fact on causation for his professional negligence and fiduciary duty claims. In reconciling these two conclusions, we emphasize that Steven forfeited any argument that he could have cured his fraud pleadings. Again, we need not resolve whether Steven could have cured his defective pleadings by alleging the same facts that create a triable issue of material fact on causation with respect to his surviving causes of action.

_____
Sweet, J.*

WE CONCUR:


_____
Streeter, Acting P. J.


_____
Goldman, J.


*Dutton v. Ziegler*/A172146


_____

    * Judge of the Superior Court of California, County of Marin, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23